# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

TEMUJIN KENSU #189355,
f/k/a FREDERICK FREEMAN,

    Plaintiff,

v.

BORGERDING, M.D., et al

    Defendants,

Case No: 4:16-cv-13505
District Judge: Linda V. Parker
Magistrate Judge: Stephanie Dawkins Davis

| EXCOLO LAW, PLLC | CHAPMAN LAW GROUP |
|---|---|
| Solomon M. Radner (P73653) | Ronald W. Chapman, Esq., M.P.A., LL.M (P37603) |
| 26700 Lahser Rd., Suite 401 | Carly Van Thomme (P59706) |
| Southfield, MI 48033 | Attorneys for Corizon, Inc. and Robert Lacy, D.O. |
| (248) 291-9712 | 1441 West Long Lake Rd., Suite 310 |
| sradner@excololaw.com | Troy, MI 48098 |
| | (248) 644-6326 |
| | rchapman@chapmanlawgroup.com |
| | cvanthomme@chapmanlawgroup.com |

**EXHIBIT A TO DEFENDANTS CORIZON, INC. AND ROBERT LACY D.O.'S BRIEF OPPOSING PLAINTIFF'S EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

**EXHIBIT A**    Affidavit of Robert Lacy, D.O.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

TEMUJIN KENSU #189355,
f/k/a FREDERICK FREEMAN,

    Plaintiff,

v.

BORGERDING, M.D., et al

    Defendants,

Case No: 4:16-cv-13505
District Judge: Linda V. Parker
Magistrate Judge: Stephanie Dawkins Davis

| EXCOLO LAW, PLLC | CHAPMAN LAW GROUP |
|---|---|
| Solomon M. Radner (P73653) | Ronald W. Chapman, Esq., M.P.A., LL.M (P37603) |
| 26700 Lahser Rd., Suite 401 | Carly Van Thomme (P59706) |
| Southfield, MI 48033 | Patrick L. Klida (P78737) |
| (248) 291-9712 | Attorneys for Corizon, Inc. and Robert Lacy, D.O. |
| sradner@excololaw.com | 1441 West Long Lake Rd., Suite 310 |
| | Troy, MI 48098 |
| | (248) 644-6326 |
| | rchapman@chapmanlawgroup.com |
| | cvanthomme@chapmanlawgroup.com |
| | pklida@chapmanlawgroup.com |

**AFFIDAVIT OF ROBERT LACY, D.O.**

# AFFIDAVIT OF ROBERT LACY, D.O.

STATE OF MICHIGAN         )
                          )ss
COUNTY OF Genesee         )

I, ROBERT LACY, D.O., first being duly sworn on oath, state that if I were called to testify as a witness in this matter, I would testify to the following facts based upon my personal knowledge and review of Temujin Kensu's Michigan Department of Corrections medical chart:

1. I am Doctor of Osteopathic Medicine licensed to practice in the State of Michigan.

2. I am a Regional Medical Director for Corizon, LLC.

3. As Regional Medical Director, I lack the authority or control to make any determination over what personal property Mr. Kensu may possess, including but not limited to: legal paper, legal books, and typewriters.

4. I was personally involved in Temujin Kensu's medical care on two occasions between May and July 2016.

5. On May 2, 2016, I evaluated Mr. Kensu in order to determine whether a knee brace was medically necessary.

6. I began my exam with a posterior drawer test on both knees. Upon examination, Mr. Kensu's right knee presented as very weakly positive; it had about 1 cm of additional movement in the posterior direction compared

to the left; however, there was no thumb sign. During extension, the right knee locked and made a popping sound at about 30 degrees; this indicated that there was significant internal derangement to the knee. Based on this examination, I referred Mr. Kensu for an MRI and wrote him a new medical detail, which allowed him to keep his knee brace until the results of the MRI were available.

7. On May 2, 2016, I further evaluated Mr. Kensu in order to determine the medical necessity of additional medical accommodations that Mr. Kensu requested.

8. These requested medical accommodations included inversion boots, glucosamine/chondroitin supplements, and/or permission to order unspecified "natural products." I informed Mr. Kensu that I reviewed his complete medical chart and could not provide him medical accommodations for the above items for two reasons.

9. First, there was nothing in Mr. Kensu's medical record to indicate their necessity. Second, I was unaware of any evidence-based medicine that indicated any potential beneficial use.

10. Mr. Kensu expressed the belief that, since he had previously used these items and experienced symptom relief, I was legally obligated to accept such claims as evidence.

11. Mr. Kensu replied by threatening to file a complaint against me with the medical board and threatening to file a lawsuit. He then left the exam room.

12. I again saw Mr. Kensu on July 6, 2016. The purpose of this visit was to discuss Mr. Kensu's remaining special medical accommodation requests.

13. I informed Mr. Kensu that I could not approve any of his special accommodations requests, because they lacked any medical necessity.

14. Upon hearing this, Mr. Kensu became angry and immediately left the room, telling staff that he never wanted to see me again.

15. I originally had planned to discuss with Mr. Kensu the reasoning for my decision not to provide his requested special accommodations; however, he left the exam room before I had the opportunity. If Mr. Kensu had not left the exam room, I would have had that discussion with him.

16. The following are each of the conditions Mr. Kensu claims he has, the special accommodation requests he made, and my reasoning for denying them:

   a. Mr. Kensu requested special medical accommodations for a TENS unit, support belt, inversion boots/clips, and heating pad, for the management of chronic (lasting longer than 12 weeks) low back pain. According to evidence based, peer-reviewed medical literature, none of these products has proven effective and some may

4

even be harmful. For example, the Up-to-Date article *Subacute and chronic low back pain: Pharmacologic and Noninterventional Treatment* recommends to avoiding TENS units, traction (inversion boots), and support belts. Any studies showing potential benefits were too small and poorly designed to be reliable medical evidence. The most reliable studies show that TENS, traction, and belts are no more effective than a placebo. Furthermore, heating pads are not mentioned at all as a treatment for chronic low back pain. Even in cases of osteoarthritis, there is a paucity of adequately controlled, randomized, clinical studies to support the use of heating pads. The relief obtained from a heating pad is probably similar to the effects of using Muscle Balm from the prison store, although there is no medical evidence to support the use of either. The recommended treatment for chronic low back pain consists of exercise therapy with strengthening and stretching exercises. Furthermore, Mr. Kensu indicated that he had previously undergone physical therapy and received instructions on back exercises. Over-the-counter medications are appropriate for exacerbations of chronic back pain. These medications are available from the prison store and include Acetaminophen, Ibuprofen, and Naproxen.

b. Mr. Kensu also requested special medical accommodations for the treatment of various musculoskeletal issues, including gel insoles, high-top shoes, an ankle sleeve, an elbow sleeve, and Glucosamine/Chondroitin/MSM Joint Compound.

    i. Gel insoles reduce foot fatigue and soreness from prolonged standing or walking. Simply avoiding standing or walking for long periods is a more effective way of managing sore feet. Other remedies include stretches, self-massage, and over-the counter medications like Acetaminophen, Ibuprofen, or Naproxen, which patients can purchase from the prison store. While Mr. Kensu does not have a diagnosis identifying any specific cause of foot pain, in the event that he did, his medical providers could offer specific treatment such as steroid injections, stretching exercises, immobilization, or other treatment depending on the diagnosis. To the best of my knowledge, there is no evidence-based medical literature supporting the use of gel insoles.

    ii. High-top shoes and boots do not provide support, because they are mechanically incapable of doing so. If ankle instability requires additional support, proper support requires

6

        a ridged brace that is fitted and straps to the foot and calf. Ankle instability results from torn ligaments in the ankle; it is diagnosed through a physical examination and confirmed with imaging. Ankle instability causes the patient to fall or have great difficulty when walking. None of the above is applicable to Mr. Kensu.

iii. Ankle and elbow sleeves fail to provide any additional support, because they are flexible and have no ridged components. Such sleeves do restrict movement and are useful in treating certain ligament injuries and sprains; they also provide compression and reduce swelling. However, Mr. Kensu lacks any condition requiring treatment with restricted movement or compression. Mr. Kensu's medical record shows that despite him undergoing numerous examinations, he has no relevant history of swelling, sprain, or ligament injury. Moreover, in a scenario where someone receives such diagnosis, we typically use walking boots for the ankle, ACE wraps, and compression hose or sleeves in order to restrict movement. While ankle or elbow sleeves may have a role in treating acute injuries, they do not treat chronic pain. The

        appropriate treatment for mild to moderate chronic joint pain consists of stretches, self-massage, and over-the counter medications like Acetaminophen, Ibuprofen, or Naproxen. Mr. Kensu also can purchase Muscle Balm from the prison store.

    iv. According to Up-to-Date, the use of glucosamine and chondroitin has been controversial and is of uncertain benefit. Results of randomized trials have varied and use of these medications is not advised (*Initial pharmacologic therapy of osteoarthritis*; www.Up-to-Date.com). Joint pain can be treated safely and effectively with over-the-counter medications such as Acetaminophen, Ibuprofen, or Naproxen (available from the prison store). Additionally, Mr. Kensu also should consider refraining from activities that put excessive stress on the joints, like weightlifting. Accordingly, use of these supplements is not medically necessary for Mr. Kensu.

c. Mr. Kensu also requested numerous special medical accommodations related to his diet including: a gluten/dairy/artificial sweetener–free diet, Vitamin

8

D/multivitamins, acidophilus/probiotics, a detail to purchase unspecified "natural health products," and Azulfidine.

    i. Mr. Kensu has never received a diagnosis which indicated he has a sensitivity or intolerance to gluten, dairy, or artificial sweetener. Mr. Kensu's gluten sensitivity tests were negative. Lactose intolerance is usually diagnosed based on the patient's symptoms. There is no record of Mr. Kensu ever receiving such diagnosis. While a gastroenterologist suggested that Mr. Kensu avoid artificial sweeteners during one of his hospital stays, such advice lacks any supporting test results or evidence-based medicine. Furthermore, patients with food sensitivities always can choose something different to eat in the chow hall. Mr. Kensu is free to avoid gluten, dairy, and artificial sweeteners on his own, if he so chooses; however, a special accommodation is not required.

    ii. There is no evidence to suggest that Mr. Kensu is deficient in either Vitamin D or any other vitamin generally. In the absence of a vitamin deficiency, taking additional supplements is not advised. Regardless, Mr. Kensu can purchase Centrum Silver, One-a-Day (with or without iron),

       Vitamin C, and Vitamin E at the prison store. Additionally, multivitamins Centrum and One-a-Day both contain Vitamin D. Accordingly, Mr. Kensu can purchase any of these items and does not require a special accommodation.

iii. Mr. Kensu's request for an accommodation allowing him to purchase "natural health products" is also medically unnecessary. While there are exceptions, the vast majority of natural health products lack evidence to support their use or effectiveness. Without knowing which specific products Mr. Kensu would like, I cannot give an opinion or offer alternatives.

iv. Mr. Kensu requests Azulfidine for gastrointestinal symptoms. The only FDA-approved gastrointestinal indication for Azulfidine is for the treatment of ulcerative colitis. Ulcerative colitis is diagnosed by tissue sample obtained either through colonoscopy or surgery. Mr. Kensu had both a colonoscopy and surgical resection of the colon. Yet, Mr. Kensu does not have an ulcerative colitis diagnosis. Without a tissue diagnosis of ulcerative colitis, I would not prescribe Azulfidine to anyone. For his symptoms of constipation,

bloating, gas, and abdominal discomfort, he can purchase Metamucil, Alka Seltzer, Konsyl-D Psyllium-based Laxative Fiber, laxative pills, and stomach relief products from the prison store. He also has a standing order for enemas twice daily for severe constipation. Accordingly, treating Mr. Kensu with Azulfidine would be medically unnecessary.

d. Mr. Kensu also requested accommodations for a wedge pillow and a vaporizer/nebulizer for asthma.

   i. A wedge pillow is used to elevate the head during sleep and prevent stomach acid from entering the esophagus when lying flat. Due to the anatomy of the stomach, sleeping on one's right side produces the same result. Additionally, Mr. Kensu could incorporate other effective lifestyle modifications, such as not eating several hours before bedtime, avoiding acid producing foods, and weight loss. Mr. Kensu currently has a prescription for Protonix, an acid reducer. There are also items on the store list to treat acid reflux such as Antacid Liquid, Ranitidine (Zantac), Rolaids, calcium antacid tablets, and antacid tablets. A wedge pillow is thus medically unnecessary for Mr. Kensu.

  ii. Mr. Kensu also has requested a vaporizer/nebulizer for the treatment of his asthma. However, these devices are kept at the nurse station, thereby eliminating the need for patients to possess their own personal nebulizer. Patients have access to the nebulizer 24 hours a day. This has the added benefit of ensuring that patients needing nebulizer treatment see a nurse for an assessment as well.

17. The items addressed above are the only special accommodation requests that I evaluated for Mr. Kensu. I did not evaluate, nor was I asked to evaluate, the medical necessity of the following items: a hot water bottle, a sun hat, six small meals per day or snack bags, reinstatement of a prescription for Retin-A/Panoxyl, immediate access to an orthopedist, or immediate access to a primary care doctor or internist for an independent medical evaluation.

18. Additionally, I do not have control of scheduling appointments with either nurses, medical providers, or specialists; nor did I cancel any of Mr. Kensu's appointments. Finally, the reason for each decision that I made regarding the lack of medical necessity of Mr. Kensu's special accommodation requests is evidence-based medicine. Each decision would have been the same regardless of whether or not Mr. Kensu had a lawsuit,

grievance, or administrative complaint pending. Indeed, the current lawsuit had not yet been filed when I saw Mr. Kensu in May and July 2016, and I was unaware of any other grievance or complaint that was pending at that time.

19. Moreover, at the time of my involvement in May and July 2016, I was unaware of any specific details regarding Mr. Kensu's judgment in his 2013 case. I was not a party to that case, and my role was simply to evaluate whether Mr. Kensu's requests were medically necessary.

20. Minnie Martin, M.D. has not worked for Corizon since March 19, 2015. Furthermore, I was never Dr. Martin's supervisor, as she did not work in my region.

21. Other medical providers (who work under my supervision) continue to provide Mr. Kensu with necessary and appropriate medical care.

Further affiant sayeth not.

ROBERT LACY, D.O.

Subscribed and sworn to before me
This 21 day of October, 2016.

Notary Public, State of Michigan
County of _____
My Commission Expires: _____
Acting in the County of _____

J. FRANCE
NOTARY PUBLIC, STATE OF MI
COUNTY OF GENESEE
MY COMMISSION EXPIRES Jun 16, 2017
ACTING IN COUNTY OF LAPEER

13