UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TEMUJIN KENSU,                              Case No.: 16-13505

      Plaintiff,                           Linda V. Parker
v.                                          United States District Judge

WILLIAM BORGERDING, M.D.,                   Stephanie Dawkins Davis
*et al.*,                                   United States Magistrate Judge

      Defendants.
_____/

**REPORT AND RECOMMENDATION**
**PLAINTIFF'S EMERGENCY MOTION FOR TEMPORARY**
**RESTRAINING ORDER AND MEDICAL MONITOR (Dkt. 101)**

## I.    PROCEDURAL HISTORY

Plaintiff filed his Complaint on September 28, 2016 (Dkt. 1) and filed an

Amended Complaint on October 9, 2017 (Dkt. 83), adding new parties.  District

Judge Linda V. Parker referred pretrial matters to the undersigned on November 9,

2016.  (Dkt. 30).  On April 18, 2018, plaintiff filed the instant Emergency Motion

for Temporary Restraining Order and Preliminary Injunction.  (Dkt. 101).  The

undersigned held a telephone conference on April 20 (Dkt. 102) and set the motion

for hearing on May 2.  (Dkt. 103).  During the teleconference, the issues in

plaintiff's motion were narrowed.  Plaintiff initially brought the motion for

reinstatement of his prescription Cialis, which was subsequently reinstated.

However, the medication was reinstated as a restricted drug, thus dispensed only at

health care.  The only issue remaining was the manner of dispensation of the

medication and whether to provide a medical monitor to oversee plaintiff's care.

The hearing was conducted in two days, day one commencing on May 2 and day

two commencing on June 7, 2018.  The parties provided supplemental briefing,

including proposed findings of fact and conclusions of law.  (Dkts. 122, 123, and

124).  The matter is now ready for report and recommendation.

## II.    FINDINGS OF FACT

Plaintiff has benign prostatic hypertrophy (BPH).  (T1, p. 16:6-10).[1]  After

trying several medications to treat the condition, Cialis worked best to alleviate his

symptoms.  (T1, p. 38-39:1-3).  Cialis is considered a non-formulary drug within

the Michigan Department of Corrections (MDOC).  (Plaintiff's Exhibit 1 –

Coleman Affidavit, p. 2, ¶ 8; T2, p. 57:12-13).  A medical provider who wishes to

prescribe a non-formulary drug must obtain Assistant Chief Medical Officer

(ACMO) approval.  (T1, p. 101:19-25, p. 102:1-13).  Plaintiff took the Cialis for

six months without incident.  (T2, p. 168:15-23).  Dr. Schmidt,[2] a Corizon

---

[1] The transcript is in two parts, the first—referred to as T1—is from the first day of the hearing.  The second—T2—is from the second day of the hearing.

[2] Plaintiff has pointed out that Dr. Schmidt and Dr. Coleman violated the Court's sequestration Order because they reviewed the transcript from the first day of the hearing before they testified.  The Court indicated at the start of Dr. Coleman's testimony that this violation, would be taken into account.  Though the violation appears to have been inadvertent due to a change in counsel between the first hearing day when the order was made and the second hearing day when Dr. Coleman testified, the undersigned has taken this review into consideration in weighing the testimony of Dr.'s Schmidt and Coleman.  And while the Court does not find the

employee working at the Macomb facility where plaintiff resided during the time relevant to this motion, got busy and did not submit the ACMO request to renew the prescription in time, so the prescription lapsed.  (T2, p. 123:1-4; T2, p. 127:9-18).  After about two weeks, the Cialis was reinstated.

As the ACMO, non-defendant Dr. Coleman reviewed the Cialis renewal request, but he was not aware of who plaintiff was at the time.  (T2, p. 9:2).  He determined that there was no evidence that Cardura, a formulary drug used to treat BPH, had been tried and failed.  (Plaintiff's Exhibit 1, Coleman Affidavit, p. 3, ¶¶ 10-12).  Therefore, he deferred the request.  Although Dr. Coleman found no evidence that the drug had in fact been tried and failed, Dr. Coleman did not review the paper medical records.  (T2, p. 14:2-11).  The electronic record goes back about 15 years.  (T2, p. 49:9).  There is no evidence in the electronic record that plaintiff in fact took Cardura; and such evidence would likely have been in the electronic record.  (T2, p. 58:1-16).  Instead, there are a few notations (as opposed to a prescription or other record of plaintiff having actually taken the drug) in the electronic record that plaintiff had tried and failed Cardura.

---

violation to have appreciably undermined the credibility of the doctors' testimony, the Court takes this opportunity to remind counsel of their responsibility to apprise themselves of and comply with the orders of the court or risk sanctions pursuant to the Court's inherent authority. *Chambers v. NASCO, Inc*., 501 U.S. 32, 43–50 (1991).

During the prescription lapse, plaintiff began to suffer from symptoms of BPH. (T2, p. 122:14-18). However, the lapse allowed Dr. Schmidt to learn that Cialis was effective for plaintiff and advocated for plaintiff to have the Cialis renewed. (T2, p. 128:10-14).

In addition to deferring the Cialis request, Dr. Coleman asked P.A. McKissick to review plaintiff's medical accommodations to consider removing them. Word of this request got to defendant Dr. Bomber, who is the state medical director for Corizon Health Michigan. (T2, p. 47:21). Dr. Bomber instructed Dr. Coleman to remove himself from deliberations regarding plaintiff's care, noting that Dr. Coleman was not familiar with plaintiff's care. Dr. Bomber instructed McKissick to ignore Dr. Coleman's request regarding the medical accommodations and reinstated the Cialis. (Plaintiff's Exhibit 8 – email from Dr. Bomber).

During the first six months on Cialis, plaintiff kept the drug on his person without incident. After the first six months, the drug was made restricted upon reinstatement. (T2, p. 28:10-12). This means that plaintiff must go health care, or the "medline," every day to receive his daily dosage of Cialis. (*See* T1, p. 46:10-12). The medical reasons for restricting the drug include the risk of hypotension, the potential for overdose, and negative interactions with prescription and contraband drugs. (T2, p. 50:8-12; T2, p. 64:8-9, 11-12; T2, p. 91:24-25). Dr.

4

Schmidt acknowledged that because the medline personnel do not take plaintiff's blood pressure when he picks up his Cialis dose, going to the medline does not mitigate the risk of hypotension.  (T2, p. 92:12-23; T2, p. 133:11-24).  At the time of the hearing, plaintiff had not suffered an episode of hypotension.  (T2, p. 169:13-16).  The non-medical reasons include the risk that another prisoner might attempt to take the drug form plaintiff by force, that the drug be sold or traded for among the prison population, or that the drug gets into the hands of a sexual offender who then sexually assaults another prisoner (because the drug is also used for erectile dysfunction).  (T1, p. 48:18-21; T1, p. 96:7-11; T2, p. 50:14-15).  If such instances were to occur, MDOC would be liable, not plaintiff or any other patient taking the medication.  (T1, p. 89:18-25, p. 90:1-4).

Despite these risks, there was no evidence that plaintiff himself misused the Cialis while he had it on person, that he diverted the drug, or that there is a market for the drug among prisoners.  (T1, p. 40:14-22; T2, p. 51:12-21; T1, p. 97:13-15; T2, p. 61:2-15; T2, p. 121:17; T2, p. 168:15-23).  However, plaintiff is the first and only MDOC inmate taking Cialis.  (T1, p. 40:8-10).  The medication was not made restricted because of something plaintiff did with the drug.  Rather, Cialis was made restricted for the reasons described above and because the use of this drug to treat BPH is becoming more widespread and could possibly be prescribed to another prisoner.  (T2, p. 75:20-23).  Drs. McIntire, Bomber, and Schmidt, and

PharmaCore conferred and made the decision to restrict the drug for the safety of the patient taking the medication and for the safety of the prison community. (T1, p. 82:19-20). MDOC learned from the pharmacist that the drug was kept with plaintiff in the first six months from the pharmacist. (T1, p. 82:11-17). The fact that Cialis was not restricted from the start was an oversight. (T1, p. 80:18-22).

Plaintiff has issues with his knees. As a result, when he walks he experiences pain in his knees. Walking to the medline, which was at the other side of the building caused him pain. (T2, p. 169:18-25). Plaintiff could request and obtain an accommodation to use a wheelchair, and have a prisoner push him, to get to the medline. (T2, p. 108:5-6). However, plaintiff believes there is a stigma associated with having to use a wheelchair in the prison, and he does not want to appear crippled or sick. (T2, p. 188:9-14). He also perceives a stigma attached to going to the medline. (T2, p. 176:17-24). Generally, prisoners who are suicidal or on psychotropic drugs are in the medline, and plaintiff does not want to be associated with those prisoners. Further, plaintiff testified that having to go to the medline is a significant inconvenience because if he wants to visit with family he will miss his call out and will struggle with corrections personnel to be able to go to health care later that night for the medication. (T2, p. 191:17-25, p. 192:1). Plaintiff also stated that when he is called to go to the medline he must put on his braces, boots, and gear before being able to walk to the medline. This ordeal is

distressing to him.  (T2, p. 177:15-20).  Despite these issues, some days plaintiff

can exercise two times a day.  (T2, p. 187:2-4).

Plaintiff also has shoulder issues which, according to him, have not been

addressed since he won a jury verdict against MDOC personnel in March 2016.

(T2, p. 178, 179).  As to Kensu's shoulder, Dr. Schmidt opined that a consult with

an orthopedist would be indicated in the future, but she decided to first try other

tests to find the underlying cause of the issues.  (T2, p. 136:10-20; T2, p. 145:11-

12).  Plaintiff has been seen by a rheumatologist, a neurosurgeon, and underwent a

muscle biopsy.

## III.   ANALYSIS AND CONCLUSIONS OF LAW

### A.   Motion for Injunctive Relief

Plaintiff brings this motion for injunctive relief to keep his Cialis medication

on his person.  He argues that having to walk to the medline everyday for his dose

of Cialis causes irreparable harm because he suffers pain in his knees when he

walks.  Plaintiff contends that the Cialis was made a restricted drug in retaliation

for his litigation against MDOC because there is no medical or non-medical

justification for restricting the drug.  (Dkt. 101).

As an initial matter, plaintiff does not appear to be entitled to the injunctive

relief requested because the basis for his motion is not clearly related to the claims

made in his Amended Complaint.  In his Amended Complaint, plaintiff brings

claims under the First Amendment for retaliation and the Eighth Amendment for deliberate indifference.  More particularly, Kensu alleges that MDOC officials are retaliating against him for his litigation against MDOC by taking steps to ensure that medical devices approved by medical personnel (e.g. ankle sleeves, knee braces, special meals) were taken away.  (Dkt. 83, ¶ 15; Count I).  Plaintiff also claims he was subjected to retaliation by way of his exclusion from the Dog Program and his transfers to different facilities.  (*Id.* at ¶ 23, 28).  Plaintiff has brought two different Eighth Amendment claims in his Amended Complaint: one about lack of adequate care for his medical needs (Count I) and one for being forced to live in unsanitary conditions (Count XII).[3]  (Dkt. 83).  His claim relating to inadequate care pertains to officials' decision to end his accommodations, such as his ankle sleeves, knee braces, and special meals.  (*Id.* at ¶¶ 15-16).

As explained in *Christian v. Michigan Dept. of Corr. – Health Servs.*, 2013 WL 607783, at *3 (E.D. Mich. Jan. 28, 2013),

> A court issues a preliminary injunction in a lawsuit to preserve the status quo and prevent irreparable harm until the court has an opportunity to rule on the lawsuit's merits.  Thus, a party moving for a preliminary injunction must necessarily establish a relationship between the injury claimed in the party's motion and the conduct asserted in the complaint. . . .  Although . . . new assertions might support additional claims against the same prison officials, they cannot provide the basis for a preliminary injunction in this lawsuit.

---

[3] This Eighth Amendment claim is clearly not related to the dispensation of Cialis.

(citing *Devose v. Herrington,* 42 F.3d 470, 471 (8th Cir. 1994) (internal citations omitted).  Here, the bases for plaintiff's motion are not related to his Amended Complaint allegations.  Plaintiff's claims regarding the dispensing of his Cialis and being made to walk long distances are not clearly tied to his Amended Complaint allegations of retaliation and deliberate indifference; and plaintiff makes no effort to connect the two.  Indeed, the complaint does not discuss any issue with medication (either deferral of a medication or restriction of access to medication) or being made to walk within the prison.  Accordingly, plaintiff is not entitled to injunctive relief on the basis of the dispensing of Cialis.[4]

      B.    <u>Merits of Plaintiff's Motion for Injunctive Relief[5]</u>

          1.    Legal Standards

Fed. R. Civ. P. 65 provides that the Court may issue an order for injunctive relief "only on notice to the adverse party."  Defendants received notice of the instant matter upon plaintiff's electronic filing of the instant motion.  In determining whether injunctive relief is proper, the court considers four factors: (1)

---

[4] Plaintiff also neglected to provide argument on why his Amended Complaint retaliation allegations were likely to succeed on the merits.

[5] Though the undersigned finds plaintiff's failure to link his request for injunctive relief to the claims made in his amended complaint to preclude an award of injunctive relief, the following analysis addresses plaintiff's claim if the Court were so inclined to allow for a broader reading of plaintiff's deliberate indifference and retaliation claims to encompass the facts supporting his claim for injunctive relief.

whether plaintiff has a strong likelihood of success on the merits; (2) whether plaintiff has shown irreparable injury; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction. *See Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 760 (6th Cir. 2005). The same standard applies to a motion for temporary restraining order as to a motion for preliminary injunction. *W. Michigan Family Homes LLC v. United States Dep't of Agric.*, 2013 WL 12109437, at *1 (W.D. Mich. Nov. 26, 2013), citing *Summit County Democratic Central and Executive Committee v. Blackwell*, 388 F.3d 547, 550 (6th Cir. 2004). Although no single factor is controlling, the likelihood of success on the merits is often the predominant consideration. *Gonzales v. National Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000) ("[A] finding that there is simply no likelihood of success on the merits is usually fatal.").

Plaintiff bears the burden of demonstrating entitlement to an injunction, and the burden is a heavy one because injunctive relief is "an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). Indeed, the "proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion." *Leary v. Daeschner*, 228 F.3d

729, 739 (6th Cir. 2000); *see also McNeilly v. Land*, 684 F.3d 611, 615 (6th Cir. 2012) ("The proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion because a preliminary injunction is an extraordinary remedy."). "The four considerations applicable to preliminary injunction decisions are factors to be balanced, not prerequisites that must be met." *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 230 (6th Cir. 2003) (quoting *Michigan Bell Telephone Co. v. Engler*, 257 F.3d 587, 592 (6th Cir. 2001)). A plaintiff must always, however, show irreparable harm before a preliminary injunction may issue. *Friendship Materials, Inc. v. Michigan Brick, Inc.*, 679 F.2d 100, 104 (6th Cir. 1982).

### 2.   Likelihood of Success on the Merits

As discussed above, because the bases of plaintiff's motion are not related to his Amended Complaint allegations, he is not entitled to injunctive relief. Even if the bases of his motion were related to the complaint, as addressed below, plaintiff's motion should be denied.

### a.   Retaliation

Plaintiff brought forth no argument on the likelihood of success of the retaliation claims in his Amended Complaint or his motion. He neither cites the retaliation standard nor brings argument on the likelihood of success of his

retaliation claims.[6]  Issues adverted to in a perfunctory manner are typically deemed waived.  *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones.") (citations omitted).  Even if the bases of plaintiff's motion were related to the claims in the Amended Complaint, the evidence presented does not establish likelihood of success on the merits.  In his supplemental brief, plaintiff states that his Cialis was made restricted in retaliation for the instant lawsuit.  (Dkt. 122, p. 14).

In order to establish likelihood of success on the merits of a claim for First Amendment retaliation by failure to provide adequate medical care, plaintiff must prove that: (1) he engaged in activities protected by the Constitution or statute; (2) the defendant took an adverse action that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) that this adverse action was taken at least in part because of the exercise of the protected conduct.  *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999).  The undersigned will assume for purposes of this motion that plaintiff's litigation against the prison is a protected activity.  *Eckerman v. Tennessee Dep't of Safety*, 636 F.3d 202, 208 (6th Cir. 2010)

---

[6] During oral argument, plaintiff's counsel stated that he would address retaliation when addressing the medical monitor request.  (T2, p. 207:3-15).  However, plaintiff did not address the likelihood of success of his retaliation claim in the briefing on the medical monitor issue. (Dkt. 122).

("The filing of a lawsuit to redress grievances is clearly protected activity under the First Amendment.") (citing *Thaddeus-X v. Blatter,* 175 F.3d 378, 396 (6th Cir.1999) (en banc)).

As to the second element, plaintiff provided no evidence or argument that restricting the Cialis so that he must walk to the medline for the drug would deter a person of ordinary firmness from continuing to engage in the alleged protected activity(ies).  While there is case law establishing that depriving a prisoner of medication can be the type of adverse action that would deter a person of ordinary firmness, the plaintiff cites no authority for the proposition that having to receive medication from healthcare would satisfy this element.  *See Fitts v. Snyder*, 2016 WL 3180189, at *2 (E.D. Mich. June 8, 2016) (citing *Smith v. Yarrow,* 78 Fed. Appx. 529, 540 (6th Cir. 2003); *O'Brien v. Michigan Dep't of Corr.*, 592 Fed. Appx. 338, 343 (6th Cir. 2014) ("O'Brien has alleged an adverse action because a delay in treatment and discontinuance of medication would likely deter a prisoner like O'Brien.").  It is clear that plaintiff is not prevented from taking Cialis; instead, he must get his daily dose from healthcare rather than keeping the medication in his cell.  "[R]outine inconveniences of prison life . . . do not constitute adverse action."  *Reynolds–Bey v. Harris,* 428 Fed. Appx. 493, 503 (6th Cir. 2011).

At the hearing, plaintiff discussed there being a stigma attached to going to the medline to receive medication but provided no testimony or other evidence that this stigma is enough to keep a person of ordinary firmness from engaging in protected activity.  Plaintiff is not the only prisoner going to the medline for medication,[7] and there is no indication that those prisoners are thereby deterred from engaging in protected activity.  The Cialis restriction has not prevented plaintiff from engaging in litigation activity in this case: he brought this motion for injunctive relief and has otherwise been active in litigating this case.

Even if plaintiff had established the first two elements of a retaliation claim, plaintiff has not satisfied the third element – i.e. that his Cialis was restricted at least in part because of his exercise of protected conduct.  To satisfy the third factor, plaintiff must demonstrate that his protected activity was a substantial or motivating factor in the adverse action taken by defendants.  Specifically, plaintiff must point to specific, nonconclusory evidence reasonably linking his protected activity to the adverse action.  *Rodgers v. Banks,* 344 F.3d 587, 602 (6th Cir.2003). The Sixth Circuit has interpreted this inquiry to mean that a motivating factor is "essentially but-for cause-without which the action being challenged simply would not have been taken."  *Vereecke,* 609 F.3d at 400 (quoting *Leonard v.*

---

[7] At the hearing plaintiff explained that prisoners who are suicidal or taking psychotropic medication must go to the medline.  It would seem, then, that plaintiff is not the only prisoner going to the medline.

*Robinson,* 477 F.3d 347, 355 (6th Cir.2007), and *Greene v. Barber,* 310 F.3d 889, 897 (6th Cir.2002)).

Plaintiff asserts that there is no medical or non-medical basis for restricting the drug, and so the motive behind the restriction was retaliation.  (Dkt. 122, at p. 14-15).  Plaintiff's assertion is nothing more than the conclusory and speculative statement that the defendants restricted the medication in retaliation for litigation. As discussed in *Rodgers,* 344 F.3d at 602, plaintiff must point to specific, *nonconclusory* evidence reasonably linking his protected activity to the adverse action.  *See also Harbin–Bey v. Rutter,* 420 F.3d 571, 580 (6th Cir.2005) ("[C]onclusory allegations of retaliatory motive 'unsupported by material facts will not be sufficient to state . . . a claim under § 1983.'"); *Sizemore v. Soc. Sec. Admin.*, 2005 WL 3789966, at *1 (S.D. Ohio May 2, 2005), *report and recommendation adopted*, WL 406612 (S.D. Ohio Feb. 16, 2006) ("[C]onclusory statements presented in the motion are insufficient to show a likelihood of success on the merits or that, in the absence of injunctive relief, he would suffer irreparable harm.") (citing *Rock & Roll Hall of Fame & Museum, Inc. v. Gentile Prods.,* 134 F.3d 749, 753 (6th Cir. 1998)); *Oliver v. Palus*, 2009 WL 2170270, at *2 (E.D. Mich. July 16, 2009) ("The Plaintiff has not alleged any facts, beyond the conclusory statement that acts of retaliation "are common place within the

MDOC," showing that he has been retaliated against, or will be retaliated against because he filed this lawsuit."). Plaintiff has therefore not met his burden.

In any event, the physicians and nurse Cooper provided both medical and non-medical reasons for restricting Cialis: risk of hypotension, overdose, use of force to take the drug away from the patient, recreational use among prisoners (including those who could suffer adverse side effects), and sexual assault, none of which point to retaliation. As Cooper testified, there is the possibility that an inmate with a history of sexual assault could get a hold of the drug and then sexually assault another prisoner. It is the MDOC who is charged with maintaining the safety of the prison and prisoners. The physicians agreed that there was no evidence that plaintiff misused the Cialis or diverted the drug to another inmate. Further, Dr. Bomber stated that the use of Cialis to treat BPH is becoming more widespread; plaintiff is not likely to be the last or only prisoner taking Cialis. (T2, p. 75:20-23). Thus, although there is no history of plaintiff himself misusing or abusing Cialis, the prison has to be mindful of the health and safety of prisoners in the future. (T2, p. 80:22-25). Given this testimony, it would seem that the decision to restrict Cialis was not made simply because plaintiff is the prisoner taking the drug. Rather, the drug is restricted for safety and security reasons, regardless of whether plaintiff is the only inmate using it or there are other inmates on the drug in the future.

Plaintiff states that there is disagreement among defendant witnesses over whether the deferral of the Cialis renewal request was in retaliation, citing HUM Cooper's testimony.  (Dkt. 122, at p. 5).  Contrary to plaintiff's assertion, however, there is no such disagreement; Cooper did not testify that Dr. Coleman deferred the Cialis request out of retaliation.  Instead, Cooper was asked to give non-medical reasons for deferring the request.  The exchange between Cooper and plaintiff's counsel is as follows:

> Q.  I asked you what non-medical reasons why Dr. Coleman might have been taking this action [discontinuing the Cialis].  Do you recall that now?
> A.  Yes.
> Q.  Okay.  Do you recall what you answered?
> A.  Yes.
> Q.  And what were your answers?
> A.  Cost.
> Q.  Okay.
> A.  Custody reason.
> Q.  Okay.
> A.  Or just that it was Mr. Kensu.
> Q.  Okay.  And then you recall that I asked you, in other words, it might be retaliation -- it might be retaliation for this lawsuit.
> A.  And I said it could be.
> Q.  What made you say it could be?
> A.  I don't know what Dr. Coleman is thinking so I was -- you had asked me to give reasonings outside of the medical.

(T1, at p. 61:9-25).  In this exchange Cooper is not purporting to know that Dr. Coleman deferred the Cialis request in retaliation for the litigation.  Rather,

17

plaintiff's counsel solicited Cooper to posit non-medical reasons Dr. Coleman

could have for deferring the request.

Moreover, Dr. Coleman is not a defendant in this case. The third element of

a retaliation claim requires that the plaintiff show that the *defendant's* action was

taken in retaliation for engaging in a protected activity. Not only is Dr. Coleman

not a defendant to this action (or the prior lawsuit against MDOC), but Dr.

Bomber, who is a defendant in this matter, overrode Dr. Coleman's order and

reinstated the Cialis. Further, non-defendant Dr. Schmidt advocated on plaintiff's

behalf for the Cialis prescription.   (T2, p. 157:10-12). These facts do not establish

that plaintiff's litigation was the motivating factor behind denying the renewal

request.

At the hearing, plaintiff's counsel made much of the fact that other drugs,

such as Tylenol and Mobic, carry medical risks and have "yard value," yet are not

restricted. This fact does not save plaintiff's retaliation claim for two reasons.

First, as will be discussed more fully below, the MDOC is due a degree of

deference on matters involving prison administration and safety. As some of the

defendants testified, not only are there medical risks associated with Cialis, but

there are security risks involved in plaintiff having a month's supply of a drug that

is also used to treat erectile dysfunction on his person. Second, even if there are

drugs with yard value and medical risks that are not made restricted, plaintiff still

has not provided a causal link between the restriction of Cialis and his litigation against MDOC and Corizon employees.  Rather than demonstrating a causal link, the evidence demonstrates, and as HUM Cooper and Dr. McIntyre explained, that Cialis should have been restricted from the beginning, and the fact that it was not restricted from the start was an oversight.  (T1, p. 80:18-22; T2, p. 61:20-21).

b.     Deliberate Indifference

Plaintiff argues he is likely to succeed on his Eighth Amendment deliberate indifference claim for two reasons: first, he succeeded in a jury trial on a "nearly identical claim" in 2016.  (Dkt. 122, at p. 10).  Second, according to plaintiff, restricting plaintiff's access to Cialis without medical or legal justification constitutes deliberate indifference.  (*Id.* at p. 13).  Although plaintiff cites the correct legal standards for his Eighth Amendment claim (Dkt. 122, at p. 6), his argument does not connect the evidence to the standards.  Instead, as discussed more fully below, he alludes to factually distinguishable cases in which deliberate indifference was established.  For instance, he states that modifying prescription medication without regard to a prisoner's medical needs may amount to deliberate indifference.  (*Id.*) (citing *Shehee v. Saginaw Cty.*, 86 F. Supp. 3d 704, 714 (E.D. Mich. 2015)).  Further, plaintiff contends that altering a prisoner's medication in retaliation for litigation against prison staff can amount to deliberate indifference. (*Id.*) (citing *Hagan v. Dolphin*, 2014 U.S. Dist. LEXIS 146774, at *12 (M.D. Pa.

Oct. 15, 2014); *Royster v. Corizon*, 2014 U.S. Dist. LEXIS 56715, at *4 (M.D. Pa.

Apr. 22, 2014)).  Finally, plaintiff notes that in cases where restricting medication

was not evidence of deliberate indifference there was almost always an identifiable

security or medical reason specific to the prisoner which justified the restriction.

(*Id.* at p. 12) (citing *Hann v. Michigan*, 2010 U.S. Dist. LEXIS 24143, at *10 (E.D.

Mich. Feb. 25, 2010); *Sullivan v. Wilson*, 2016 U.S. Dist. LEXIS 113168, at *13-

14 (W.D. Mich. June 21, 2016); *Day v. Mathai*, 2008 U.S. Dist. LEXIS 122101, at

*25 (E.D. Mich. Mar. 7, 2008)).

In the context of medical care, a prisoner's Eighth Amendment right to be

free from cruel and unusual punishment is violated only when the prisoner can

demonstrate a "deliberate indifference" to his serious medical needs.  *Estelle v.*

*Gamble*, 429 U.S. 97, 104-06 (1976).  "Where a prisoner has received some

medical attention and the dispute is over the adequacy of treatment, federal courts

are generally reluctant to second guess medical judgments and to constitutionalize

claims that sound in state tort law."  *Westlake v. Lucas*, 537 F.2d 857, 860 n. 5 (6th

Cir. 1976) (citations omitted).  Moreover, mere negligence in identifying or

treating a medical need does not rise to the level of a valid mistreatment claim

under the Eighth Amendment.  *Estelle*, 429 U.S. at 106.  A viable Eighth

Amendment claim has two components, one objective and the other subjective.

*Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Comstock v. McCrary*, 273 F.3d

693, 702 (6th Cir. 2002). A court considering a prisoner's Eighth Amendment claim must ask both if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation and if the officials acted with a sufficiently culpable state of mind. *Hudson v. McMillian*, 503 U.S. 1, 8 (1992).

Under the objective component, "the plaintiff must allege that the medical need at issue is 'sufficiently serious.'" *Farmer*, 511 U.S. at 834. A plaintiff can demonstrate that a medical need is sufficiently serious by showing that it is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Baynes v. Cleland*, 799 F. 3d 600 (6th Cir. 2005), quoting *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008); *See also*, *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 897 (6th Cir. 2004). The subjective component requires that the defendant act with deliberate indifference to an inmate's health or safety. *Farmer*, 511 U.S. at 834. To establish the subjective component, "the plaintiff must allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded the risk." *Farmer,* 511 U.S. at 837. "Basically, there must be a knowing failure or refusal to provide urgently needed medical care which causes a residual injury that could have been prevented with

timely attention." *Lewis v. Corr. Med. Servs.*, 2009 WL 799249, at *2 (E.D. Mich. Mar. 24, 2009).

In addition to his Cialis arguments, plaintiff argues likelihood of success based on lack of adequate care for his shoulder problems. He argues that he won judgment in a prior case partly involving shoulder care, and he still has not received an orthopedic consultation for his shoulders. This argument does not advance plaintiff's motion for two reasons. First, his motion is not related to his shoulders, as it is clearly about the dispensing of Cialis. As such, success on a claim regarding his shoulders would not equate to success on a claim about dispensing medication.

In any event, plaintiff has not established the likelihood of success on his shoulder claim. Plaintiff disagrees with the manner in which his shoulder issues have been treated since winning the prior lawsuit. Dr. Schmidt explained that she determined that the appropriate course of action was to find the underlying cause of plaintiff's problems, rather than just sending him to an orthopedist. Therefore, non-defendant Dr. Schmidt ordered, and plaintiff received: a muscle biopsy, a consult with a neurosurgeon, and a consult with a rheumatologist. That plaintiff would rather have the orthopedic consult now rather than later amounts to a disagreement in the course of treatment. Disagreement in the manner of care is insufficient to sustain a deliberate indifference claim. "Where a prisoner has

received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Westlake v. Lucas*, 537 F.2d 857, 860 n. 5 (6th Cir. 1976) (citing *Owens v. Hutchinson,* 79 Fed. Appx. 159, 161 (6th Cir.2003) ("[a] patient's disagreement with his physicians over the proper medical treatment alleges no more than a medical malpractice claim, which is a tort actionable in state court, but is not cognizable as a federal constitutional claim"); s*ee also, Woodberry v. Simmons,* 146 Fed. Appx. 976, 977 (10th Cir. 2005) ("a difference of opinion between a prisoner and the prison medical staff about medical treatment does not constitute deliberate indifference"); *Estelle,* 429 U.S. at 107 (A claim that additional diagnostic techniques or treatment should have been ordered is nothing more than a medical malpractice claim-not a constitutional claim.). As such, plaintiff has not demonstrated a strong likelihood of success on the merits.

Even if plaintiff's Cialis deferral and dispensation claims were related to the Amended Complaint, plaintiff has not demonstrated a likelihood of success of the claims. The undersigned is guided by the principle that neither negligence alone, nor a disagreement over the wisdom or correctness of a medical judgment is sufficient for the purpose of a deliberate indifference claim. *Estelle v. Gamble,* 429 U.S. 97, 106 (1976); *Sanderfer v. Nichols,* 62 F.3d 151, 154–55 (6th

23

Cir. 1995).  Although plaintiff's Cialis prescription lapsed during the ACMO review, this does not rise to a constitutional violation.  Dr. Schmidt testified that the prescription lapsed due to her inability to get the ACMO request to Dr. Coleman early enough to prevent the lapse.  (T2, p. 123:1-4; T2, p. 127:9-18).  And, although Dr. Coleman deferred the prescription, this also is insufficient to demonstrate likelihood of success.  Neither Dr. Schmidt nor Dr. Coleman are defendants in this case.  The subjective prong of deliberate indifference looks specifically at action or inaction taken by *defendant(s)*.  Setting aside Dr. Schmidt's status as a non-defendant, it does not appear that the lapse in the prescription was due to anything more than, at most, mere negligence or medical malpractice.  Neither negligence nor medical malpractice are sufficient to satisfy a deliberate indifference claim.  *Estelle*, 429 U.S. at 107 ("[A]n inadvertent failure to provide adequate medical care (such as medical malpractice) cannot be said to constitute 'an unnecessary and wanton infliction of pain' or to be 'repugnant to the conscience of mankind.'"); *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001).  There is no evidence that Dr. Schmidt's lateness was the result of reckless disregard of a medical risk.[8]   Indeed, Dr. Schmidt advocated for reinstatement of

_____

[8] Dr. Schmidt initially testified that she let the prescription lapse to see if it was working.  (T2, p. 122:8-11).  She later clarified her testimony, explaining that it lapsed because she did not get the ACMO request out in time, and that during the lapse she was able to see that Cialis worked well for plaintiff.  (T2:123:7-8).  She then advocated on plaintiff's behalf for the Cialis.

the Cialis.  (T2, p. 157:10-12).  The same is true for Dr. Coleman.  There is no

evidence that his deferral was the result of reckless disregard of a medical risk;

rather, he deferred the Cialis because there was no evidence in the electronic record

that the formulary drug Cardura had been tried and failed, and he is correct.

Plaintiff's argument that the restriction of Cialis amounts to deliberate

indifference to medical needs presents more as a disagreement on the manner of

dispensation of the medication, rather than lack of adequate care or lack of care at

all.  Typically, disagreement between the prisoner and the prison health personnel

about the manner or adequacy of medical treatment is insufficient to warrant

injunctive relief.  *Brian Courtney v. Prison Health Services*, 2011 WL 1527971, at

*2 (E.D. Mich. Apr. 22, 2011) (citations omitted); *see also Flentall v. Lange*, 2011

WL 6937612, at *3 (W.D. Mich. Dec. 1, 2011), *report and recommendation*

*approved*, 2012 WL 19421 (W.D. Mich. Jan. 3, 2012) ("While plaintiff apparently

preferred to have uncrushed Methadone, his preference for this method

of dispensing the medication does not form the basis for a federal constitutional

claim.").  Restricting the manner in which plaintiff receives his Cialis does not

show wanton or reckless disregard for plaintiff's health; indeed, it is not as if

plaintiff is kept from taking the medication altogether.

Plaintiff's citations otherwise are unavailing.  In *Shehee v. Saginaw Cty.*, 86

F. Supp. 3d 704, 714 (E.D. Mich. 2015), the court stated that there was "something

to" the claims that the prison maintained a policy of modifying prescription medication without regard to a prisoner's individual medical needs and restricting physician access.  However, the court ultimately held that because the physician had treated the plaintiff with some treatment for his medical condition that appeared to be adequate, the medical care did not amount to deliberate indifference.  *Id.*  In *Hagan v. Dolphin*, the court found the plaintiff's complaint sufficient to withstand a motion to dismiss where the plaintiff alleged that the health care personnel took plaintiff off his medication because he had filed grievances and removed a reference to his psychotic disorder from his medical record, thereby depriving him of mental health care.  2014 WL 5242377, at *5-6 (M.D.Pa. Oct. 15, 2014).  In *Royster v. Corizon*, 2014 WL 1655088 (M.D.Pa. Apr. 23, 2014), the medical personnel restricted the plaintiff's migraine medication to twice daily, at set times, knowing that gaps could exist between his need for the medication and its next scheduled delivery.  *Id.* at *6.  The court concluded that, for purposes of the motion to dismiss, the defendants' act of restricting the availability of the medication coupled with the plaintiff's contention that they restricted the medication to prevent him filing grievances was sufficient for the claim to move forward.  *Id.* at *6, 9.  Like the plaintiff in *Shehee*, Kensu is receiving care for his BPH in the form of his daily dose of Cialis, a medication which is adequate at treating the condition.  The fact that he is required to stand in

the medline to obtain his medication does not undermine the medication's effectiveness.  Thus, under *Shehee*, the medical care he is receiving concerning the dispensing of the Cialis does not amount to deliberate indifference.  *Hagan* and *Royster* are distinguishable from Kensu's case.  Here, Kensu has not demonstrated that the defendants took away his medication, prevented him from receiving healthcare for BPH, or restricted his access to Cialis such that he cannot receive his daily dose to treat the condition.[9]

To the extent that plaintiff is arguing that the restriction amounts to deliberate indifference to plaintiff's medical needs because it forces him to walk a great distance every day, the argument is unpersuasive.  Even assuming plaintiff suffers significant pain during his walk to and from the medline, plaintiff is not required to walk.  Plaintiff may request an accommodation to use the wheelchair kept in his cell, and may be assigned another prisoner to push him.  (T2, p. 108:5-6).  In fact, plaintiff used a wheelchair to get the medline after his muscle biopsy with no reported problems.  (T2, p. 170:10-16).  Plaintiff chooses not the use the wheelchair because he believes its use carries a stigma of being weak or ill.  (T2, p.

---

[9] Plaintiff stated that he missed some doses of his medication because of difficulty in getting to the medline, or, if he has visitors, he misses his call-out for the medication and has to struggle with prison staff to let him to the medline later to get the dose.  However, these instances do not suggest that the defendants are actively preventing plaintiff from receiving his daily dose.

188:9-14).  But Kensu provided no evidence to suggest that he was actually perceived as weak or ill when he used the wheelchair after his biopsy.

As to plaintiff's argument that his success in his prior lawsuit demonstrates likely success in this lawsuit, the argument is unavailing.  Not all the defendants in this case were defendants in the prior litigation (and neither Corizon nor any Corizon employees were defendants (Dkt. 124, at p. 6)).  Further, he has received medical care since the prior litigation.  Consequently, the factual circumstances at the time of the prior judgment are not identical to the circumstances in this case. There could be a different result in this case.

3.     Irreparable harm

The moving party must show that irreparable harm is "both certain and immediate, rather than speculative or theoretical."  *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog,* 945 F.2d 150, 154 (6th Cir. 1991).  *See also Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 22, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008) ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.").  "A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages."  *Overstreet v. Lexington-Fayette Urban Cty. Gov't,* 305 F.3d 566, 578

(6th Cir. 2002); *see also Hawkins v. Summit Cty.*, No. 5:11CV2753, 2012 WL 4483871, at *8-9 (N.D. Ohio Jan. 3, 2012) (holding that an alleged inconvenience did not constitute irreparable harm because courts often award damages for pain, suffering, and other serious inconveniences).

Plaintiff argues that irreparable harm is presumed where there is a constitutional violation. (Dkt. 122, at p. 13). However, as demonstrated above, plaintiff has not established the likelihood of success on his constitutional claims. Therefore, it is inappropriate in this instance to presume that plaintiff will be irreparably harmed by continuing the Cialis as a restricted medication. *See Dulak v. Corizon Inc.*, 2014 WL 4678085, at *6 (E.D. Mich. June 9, 2014), *report and recommendation adopted*, 2014 WL 4678086 (E.D. Mich. Sept. 18, 2014) ("[B]ecause it appears unlikely, on the current record, that plaintiff will be able to demonstrate that he has a cognizable constitutional claim, he is not entitled to a presumption of irreparable harm based on the alleged constitutional violation.").

Second, plaintiff contends that he is significantly inconvenienced by having to walk a long distance[10] to the medline every day and that during this walk he suffers significant pain in his knees. He also testified that in preparation for his

---

[10] It is unclear whether plaintiff still must walk from one end of the prison to the other end to get to health care. Plaintiff brought an emergency motion for TRO to prevent his transfer to another prison during the pendency of this motion in June 2018. The motion was denied. (Dkt. 115, 116). It seems likley that plaintiff was then transferred to another prison, but it is not clear whether plaintiff's walk to health care has been altered.

walk to the medline he has to put on his braces and his boots, which is distressing to him.  Granted, walking in pain is an unpleasant experience, but plaintiff is not required to do so.  As noted above, plaintiff may request an accommodation to use a wheelchair to get to the medline.  Using the wheelchair would prevent plaintiff from suffering pain from walking.  Plaintiff chooses not to use a wheelchair due to stigma, even though he used the wheelchair to get to the medline after his muscle biopsy, seemingly with no trouble from other inmates due to the alleged stigma. Further, plaintiff does not claim or provide proof that his knee problems will worsen as he continues to walk to healthcare.  Without more, his claim of significant pain from walking is insufficient to warrant relief prior to a resolution on the merits.  *See Rhinehart v. Scutt*, 509 Fed. Appx. 510, 514 (6th Cir. 2013) ("Rhinehart's entire allegation is that he is being harmed, but he has failed to show that his condition will worsen if he is denied his requested relief immediately. As the district court noted, there is no question that Rhinehart is suffering. But the seriousness of his condition is not, without some constitutional deprivation, enough to show a harm that requires relief prior to the adjudication of his claims.").

Moreover, it is not clear that the requested relief will address plaintiff's pain and inconvenience from being made to walk.  Since, based on his testimony, he has effectively shunned the use of a wheelchair presumably he walks elsewhere in the facility: to the chow hall, within his cell, to the yard, to workout sometimes two

times a day, and to health care for visits with nurses or doctors which me makes

frequently[11] (these particular trips to healthcare apparently are not of concern to

plaintiff).  Keeping Cialis on person will not mean that plaintiff will not have to

walk in the prison, and he will continue to walk to healthcare for check-ups and the

like.  Moreover, pain is a compensable, rather than irreparable.  *See Hawkins*,

*supra*.  Even if the pain and inconvenience of walking to the medline constituted

irreparable harm, the final two factors counsel against awarding injunctive relief.

### 3.    Harm to Others/Public Interest

The undersigned will address the last two elements together.  While

acknowledging that interference by the courts in prison administration is

disruptive, plaintiff argues that the violation of constitutional rights overrides the

concern.  He states that it offends public policy that defendants should be able to

act with deliberate indifference to plaintiff's medical needs.  (Dkt. 122, at p. 15-

16).  Again, plaintiff has not established the likelihood of success of his

constitutional claims.

In considering harm to others and the public interest in issuing an injunction,

the undersigned acknowledges that "[p]rison officials must be free to take

appropriate action to ensure the safety of inmates and corrections personnel and to

---

[11] Dr. Schmidt agreed with plaintiff's counsel that plaintiff ranks high on a list of patients frequently going to health care.  (T2, p. 134:4-9).

prevent escape or unauthorized entry." *Bell v. Wolfish*, 441 U.S. 520, 546 (1979). Further, "[p]rison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id.* at 547. As such, "courts, especially federal courts, should be reluctant to become involved in the internal administration of state prisons." *Hanna v. Toner,* 630 F.2d 442, 444 (6th Cir. 1980).

As discussed above, MDOC and Corizon have explained the medical and non-medical reasons for restricting plaintiff's access to Cialis. The non-medical reasons implicate prison and prisoner safety: preventing a drug that could have yard value from becoming available to the prison population at large, the risk of sexual assault by a prisoner who comes into possession of the drug, the risk to the patient of having the drug taken by force or other means, and the risk of adverse reaction to another inmate who, without prescription, takes the drug. Given the deference accorded to prison administrators in decisions on prisoner safety, MDOC and Corizon's valid explanation of the risks associated with Cialis as keep on person, and the bare showing of likelihood of success and irreparable harm, this Court should refrain from entangling itself in decisions as to prison administration, including whether to restrict Cialis or allow it as keep on person. *See Blau v. Prison Health Servs., Inc*., 2012 WL 289282, at *6 (W.D. Mich. Jan. 31, 2012)

("Any interference by the federal courts in the administration of state prisons,

including interference in the administration of medical treatment, is necessarily

disruptive. Prison officials and Plaintiff's medical providers are in a far better

position to make treatment decisions than the Court."); *Hunt v. Mohr*, 2012 WL

368060, at *3 (S.D. Ohio Feb. 3, 2012).  As such, the undersigned suggests that

plaintiff is not entitled to injunctive relief.

   C.   Plaintiff's Request for Medical Monitor

   In the request for relief section of his motion for injunctive relief, plaintiff

sought the appointment of a medical monitor to oversee plaintiff's medical care.

(Dkt. 101, at p. 8).  The undersigned did not take testimony on the issue of a

medical monitor but required the parties to brief the issue in their supplemental

post-hearing briefs.  (T2, p. 214).  Although plaintiff requests a separate hearing

allowing for live testimony on the issue of the medical monitor, under the

circumstances the undersigned suggests that a hearing is not necessary, and that

plaintiff's request should be denied.

   Plaintiff brings this request for a medical monitor or special master under

Fed. R. Civ. P. 53(a),[12] to address pretrial and post-trial matters that cannot

---

[12] MDOC defendants contend that plaintiff did not specify under which subsection of Rule 53(a) he brought his request, and presumed he brought the request under subsection (B). (Dkt. 123, at p. 14).  MDOC has perhaps misread plaintiff's brief.  While plaintiff does not specifically cite subsection (C), he quotes (C) in addition to subsection (B).

effectively and timely be addressed by an available judge or for exceptional circumstances.  (Dkt. 122, at p. 16).  Citing *Hadix v. Caruso*, 465 F. Supp. 2d 776, 779 (W.D. Mich. 2006), plaintiff contends that medical monitors are appropriate to remedy constitutional violations.  (*Id.*).  Plaintiff argues that appointment of a special master is appropriate to evaluate the quality of medical care available to inmates or where there are instances of non-compliance with court orders.  (*Id.* at p. 17).  Regarding plaintiff's health care, he states again that he has been denied treatment for the issues that were the subject of his successful jury trial in 2016, that since testifying on June 7, 2018, plaintiff has been denied access to medical care,[13] and that MDOC is withholding medical records from plaintiff.  (*Id.* at p. 18).  Plaintiff also points out that defendants have instructed their employees to stop sending emails regarding plaintiff's health care.  (*Id.* at p. 19).

Fed. R. Civ. P. 53(a) provides,

> (1) *Scope.* Unless a statute provides otherwise, a court may appoint a master only to:
>
> (A) perform duties consented to by the parties;
>
> (B) hold trial proceedings and make or recommend findings of fact on issues to be decided without a jury if appointment is warranted by:
> (i) some exceptional condition; or
> (ii) the need to perform an accounting or resolve a difficult computation of damages; or

---

[13] Plaintiff provides no evidence by way of affidavit, declaration, or other means to support this contention.

> (C) address pretrial and posttrial matters that cannot be
> effectively and timely addressed by an available district
> judge or magistrate judge of the district.

As stated, plaintiff quotes language from both subsections (B) and (C).  However,

aside from noting "exceptional circumstances" as a means to obtain a special

master, he does not in any way discuss a request for the medical monitor to hold

any proceedings on issues to be decided without a jury.  Rather, plaintiff seeks a

medical monitor only to monitor plaintiff's health care.  As such, it would seem

that plaintiff seeks something more akin to a medical monitor appointed under

subsection (C) only.

The undersigned suggests that a medical monitor should not be appointed.

First, plaintiff did not adequately address the requirements of subsection (C).  This

subsection allows for the appointment of a special master to address pre- and post-

trial matters.  The Committee Notes to the 2003 Amendment make clear that a

"pretrial master should be appointed only when the need is clear."[14]  Further, the

amendment contemplates the use of pretrial masters to assist in managing complex

litigation, or in cases where expert knowledge would assist the court, such as in

interpreting patent claims.  It would seem that plaintiff is not seeking a master to

---

[14] Plaintiff is seeking a special master to monitor his health care now.  This case has not yet gone to trial or judgment.  Therefore, plaintiff's request cannot reasonably be construed as for a special master to conduct post-trial proceedings.

address pretrial matters, but rather would like the special master to address the issues for which plaintiff seeks a jury trial, i.e. the adequacy of his medical care. This case is not an example of complex litigation nor does it involve such complex matters as patent interpretation or otherwise requiring an expert to assist the Court.

The rule also contemplates appointment of a special master to address matters *that cannot be effectively and timely addressed by an available judge*. Plaintiff does not claim that his medical issues or complaints cannot be effectively and timely addressed in this Court. Plaintiff's pretrial motion for injunctive relief is addressed herein, as have been and will be his other pretrial motions. There has not been any indication that the court cannot effectively and timely address pretrial matters. Accordingly, by the guidance of the rule alone, this case does not merit appointment of a special master.

Second, appointment of a medical monitor is not appropriate in light of case law on the subject. Cases in which a special master or medical monitor was appointed are materially distinguishable from this case. For example, where the subject of the litigation involved multiple prison facilities and a large number of inmates receiving substandard medical care, a special master was appointed to oversee post-judgment matters. In *Hadix v. Caruso*, 465 F. Supp. 2d 776 (W.D. Mich. 2006), the litigation involved multiple MDOC facilities and claims of unconstitutional conditions, including inadequate mental health care. *Id.* at 778.

The parties entered a consent decree pertaining to prisoner health care at the facilities.  *Id.* at 779.  The consent decree provided that each prisoner would receive proper medical care; however, there were delays in administering the health care.  As a consequence of the delays and continuing Eighth Amendment violations (including death due to lack of medical care and delays in medical treatment for conditions such as cancer), the court appointed a medical monitor followed by development of a remedial plan.  *Id.* at 779-80.  The court also established an Office of the Independent Monitor capable of receiving and acting on prisoner complaints and providing health care at the facilities.  *Id.* at 810.  Here, unlike in *Hadix*, there is no consent decree (and thus no post-trial or post-judgment matters to be dealt with) and the Court is not faced with alleged inadequate health care across multiple MDOC facilities for potentially thousands of inmates. Instead, this case involves one prisoner and his complaints of inadequate health care.  Therefore, *Hadix* does not support the appointment of a medical monitor in this case at this time.

Other cases plaintiff cites present similar inconsistencies to the case at hand. In *Costello v. Wainwright*, 387 F. Supp. 324 (M.D. Fla. 1973), the court appointed a special master under Rule 53 to conduct a survey of the availability and quality of health care provided to a class of plaintiffs housed across Florida prison facilities to assist the court in conducting the litigation involving the prison

facilities.  *Id.* at 325.  Here, again, the Court faces a single plaintiff, not a class

action, and this case is not about care provided at multiple facilities.  The

difficulties present in *Costello* are not present here.  In *Williams v. Lane*, 851 F.2d

867 (7th Cir. 1988), another class action brought by inmates, the district court

entered judgment for plaintiffs on their free exercise, access to courts, freedom

from cruel and unusual punishment, and rights to due process and equal protection

claims.  *Id.* at 876.  The district court directed the defendants to submit a remedial

plan, but they failed to provide a plan sufficient for the court.  The court ultimately

appointed a special master under Rule 53(a)(B)[15] to assist the court in developing a

timeframe for the prison to adhere to the opinion.  *Id.*  The court acknowledged

that "judicial supervision of court orders should ordinarily be exercised directly by

a judge rather than by referral to a master."  *Id.* at 884.  However, referrals may be

appropriate "if, due to the unusual magnitude of the supervision needed in the

complex case, failure to make referral would result in inattention or undue delay."

*Id.* (quoting Manual for Complex Litigation, Second § 20.14, pp. 11–12 (1985)).

Once again, this case is not an example of complex litigation, involving only one

plaintiff and the administration of his healthcare.  While his health issues

---

[15] The Rule was amended in 2003, after *Williams* was issued.  *Williams* discussed the appointment of a special master upon a showing of an exceptional condition.  This is similar to the current rule's subsection (B).

themselves may be medically complex, this fact does not render the case itself so complex that the Court cannot adequately and timely address pretrial matters.

Moreover, as demonstrated above, plaintiff's constitutional claims as set forth in the Amended Complaint are not connected to his request for injunctive relief, and thus the merits have not been examined.  Hence, plaintiff's suggestion that a medical monitor should be appointed because of the defendants' unconstitutional health care is unconvincing.  Further, plaintiff claims that he is not receiving any medical care for the issues on which he won a jury trial, yet mentions only the lack of an orthopedic consultation.  As discussed above, Dr. Schmidt explained that she wanted plaintiff to undergo other testing first to get at the bottom of his conditions, and that she thought it likely that an orthopedic consult would be indicated in the future.  As such, it does not appear that plaintiff is simply receiving no care at all since his prior successful litigation.

The undersigned is unaware of any precedent for appointing a special master in a case such as this.  The authority plaintiff relies on appears distinguishable from this case, and thus does not support the appointment of a special master or medical monitor.  Neither does the rule itself.  Therefore, the undersigned recommends denying the request.

## IV.   RECOMMENDATION

For the reasons set forth above, the undersigned **RECOMMENDS** that plaintiff's motion for temporary restraining order and preliminary injunctive relief (Dkt. 101) and request for a medical monitor be **DENIED**.

The parties to this action may object to and seek review of this Report and Recommendation but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1981). Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed.R.Civ.P. 72(b)(2), Local Rule 72.1(d).

The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc.  If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  October 31, 2018                    s/Stephanie Dawkins Davis
                                           Stephanie Dawkins Davis
                                           United States Magistrate Judge

## CERTIFICATE OF SERVICE

I certify that on October 31, 2018, I electronically field the foregoing paper with the Clerk of the Court using the ECF system, which will send electronic notification to all counsel of record.

s/Tammy Hallwood
Case Manager
(810) 341-7887
tammy_hallwood@mied.uscourts.gov