UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TEMUJIN KENSU,                              Case No.: 16-13505

      Plaintiff,                          Linda V. Parker
v.                                          United States District Judge

WILLIAM BORGERDING, *et al*,                Stephanie Dawkins Davis
                                            United States Magistrate Judge
      Defendants.
_____/

**REPORT AND RECOMMENDATION**
**DEFENDANTS' MOTIONS FOR**
**SUMMARY JUDGMENT (Dkts. 138, 140)**

## I.    PROCEDURAL HISTORY AND BACKGROUND

Plaintiff Temujin Kensu is a prisoner in the custody of the Michigan

Department of Corrections.  He filed the instant action on September 28, 2016

under 42 U.S.C. § 1983, alleging that the defendants violated his rights under the

First, Eighth, and Fourteenth Amendments while he was housed at the Macomb

Correctional Facility (MRF).  (Dkt. 1).  He also included claims under the

Religious Land Use and Institutionalized Persons Act (RLUIPA) and the Dietary

Supplement Health Education Act (DSHEA).  Regarding his constitutional claims,

Kensu alleges that several defendants provided him no or inadequate medical care

in deliberate indifference to his serious medical needs.  He also alleges that the

defendants withheld approval for medical accommodations in retaliation for his

1

exercise of his First Amendment rights. District Judge Linda V. Parker referred pretrial matters to the undersigned. (Dkt. 30). Both the MDOC defendants and the Corizon defendants filed motions for summary judgment (Dkts. 138, 140) to which plaintiff responded (Dkts. 151, 152). The undersigned held a hearing on the motions and the matter is now ready for report and recommendation.

During all times relevant to this action, Kensu was a prisoner housed at MRF. The defendants are MDOC officials and Corizon health care professionals who were involved in decision-making or providing health care for Kensu. The facts surrounding Kensu's claims are relatively voluminous and varied. They are perhaps more easily followed if discussed in relation to the particular medical issues out of which Kensu's constitutional and statutory claims arise. Thus, rather than proceeding to an opening recitation of the facts, this report sets forth the facts in that manner.

## II.  ANALYSIS AND RECOMMENDATIONS

### A.  Standard of Review

When a party files a motion for summary judgment, it must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record...; or (B) showing that

2

the materials cited do not establish the absence or presence of a genuine dispute, or

that an adverse party cannot produce admissible evidence to support the fact."

Fed.R.Civ.P. 56(c)(1).  The standard for determining whether summary judgment

is appropriate is "whether the evidence presents a sufficient disagreement to

require submission to a jury or whether it is so one-sided that one party must

prevail as a matter of law."  *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d

433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

251-52 (1986)).  Furthermore, the evidence and all reasonable inferences must be

construed in the light most favorable to the non-moving party.  *Matsushita Elec.

Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Where the movant establishes the lack of a genuine issue of material fact,

the burden of demonstrating the existence of such an issue shifts to the non-moving

party to come forward with "specific facts showing that there is a genuine issue for

trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  That is, the party

opposing a motion for summary judgment must make an affirmative showing with

proper evidence and must "designate specific facts in affidavits, depositions, or

other factual material showing 'evidence on which the jury could reasonably find

for the plaintiff.'"  *Brown v. Scott*, 329 F.Supp.2d 905, 910 (6th Cir. 2004).  In

order to fulfill this burden, the non-moving party need only demonstrate the

minimal standard that a jury could ostensibly find in his favor.  *Anderson*, 477 U.S.

at 248; *McLean v. 988011 Ontario*, *Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

However, mere allegations or denials in the non-movant's pleadings will not

satisfy this burden, nor will a mere scintilla of evidence supporting the non-moving

party. *Anderson*, 477 U.S. at 248, 251.

The Court's role is limited to determining whether there is a genuine dispute

about a material fact, that is, if the evidence in the case "is such that a reasonable

jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

Such a determination requires that the Court "view the evidence presented through

the prism of the substantive evidentiary burden" applicable to the case. *Id*. at 254.

Thus, if the plaintiff must ultimately prove its case at trial by a preponderance of

the evidence, on a motion for summary judgment the Court must determine

whether a jury could reasonably find that the plaintiff's factual contentions are true

by a preponderance of the evidence. *See id.* at 252-53. Finally, if the nonmoving

party fails to make a sufficient showing on an essential element of its case with

respect to which it has the burden of proof, the movant is entitled to summary

judgment. *Celotex*, 477 U.S. at 323. The Court must construe Rule 56 with due

regard not only for the rights of those "asserting claims and defenses that are

adequately based in fact to have those claims and defenses tried to a jury," but also

for the rights of those "opposing such claims and defenses to demonstrate in the

manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis."  *Id*. at 327.

        B.     <u>Eighth Amendment Deliberate Indifference</u>

        1.     Evidentiary Limitations

Before addressing the merits of the defendants' motion, the Court notes that Kensu relies in part on his own affidavit as evidence to overcome summary judgment.  While using his affidavit in this manner is permissible, many of the affidavit paragraphs he cites contain inadmissible hearsay.  In these paragraphs, Kensu relays statements made by non-parties about statements made to them by defendants.  For example, to support his contention that defendant Borgerding acted with deliberate indifference to his serious medical needs, Kensu states in his affidavit that a physician's assistant and a nurse told him that Borgerding instructed them not to treat his serious medical needs and not to give him his previously-approved knee brace.  (Dkt. 151-4, Kensu Affidavit, at ¶¶ 59, 60). While statements made by a defendant are generally not hearsay, *see* Fed. R. Evid. 801(d)(2)(A), the statements made by the non-parties relaying what a defendant (Borgerding) allegedly told them are.  And, it does not appear that any hearsay exception applies. Rule 56(e) requires that material submitted in support of, or in opposition to, motions for summary judgment include facts based on personal knowledge, and that personal knowledge "must be evident from the affidavit."

*Reddy v. Good Samaritan Hosp. & Health Ctr.*, 137 F.Supp.2d 948, 956 (S.D. Ohio 2000).  Here, the evidence does not suggest that Kensu heard Borgerding instruct the nurse and P.A., such that he would have personal knowledge of the statements.  Instead, Kensu merely recounts in his affidavit out-of-court statements made to him by others.  Further, he offers these statements as proof of the matters asserted – i.e. that Borgerding told the two health care professionals not to treat his serious medical need(s).  But affidavits at the summary judgment stage may not rely upon inadmissible hearsay because inadmissible hearsay "cannot create a genuine issue of material fact," *North American Specialty Ins. Co. v. Myers*, 111 F.3d 1273, 1283 (6th Cir. 1997), and cannot be considered to overcome summary judgment, *Jacklyn v. Schering–Plough Healthcare Prod. Sales Corp.*, 176 F.3d 921, 927 (6th Cir. 1999)  Accordingly, the undersigned will not consider such hearsay statements contained in Kensu's affidavit in this report and recommendation.

> 2.    Medical Conditions and Defendants at Issue

Kensu's Eighth Amendment deliberate indifference to medical needs claim alleges "post-verdict deliberate indifference" against MDOC defendants Borgerding, Haas, and Gulick, as well as Corizon defendants Bomber and Lacy. (Dkt. 83, Count II).  The amended complaint lists nine medical conditions that form the basis for his claim that the defendants have refused or failed to adequately

6

treat him.  They are: (1) prostate disease, (2) lung disease, (3) hearing loss, (4) mastoiditis, (5) extreme heat sensitivity, (6) brain tumor, (7) spinal disease, (8) ankle problems, and (9) shoulder problems.  (Dkt. 83, ¶ 128).  He claims that the defendants "are categorically refusing to adequately treat these serious medical needs."[1]  (Dkt. 83, at ¶¶ 129-30).  The MDOC defendants argue that they were not sufficiently personally involved in Kensu's medical care to be subject to § 1983 liability in this case, and the Corizon defendants argue that there is no genuine issue of material fact as to whether they were deliberately indifferent to Kensu's serious medical needs.

> a.   Personal Involvement of MDOC Defendants Haas, Borgerding, and Gulick

The MDOC defendants' personal involvement argument is well-taken as to Haas, but not Gulick and Borgerding.  Haas was the warden.  Gulick was the Chief Accountant for MDOC and later the Health Services Administrator, a supervisory position in MDOC, during the time relevant to this case.  (Dkt. 151, p. 14).  Borgerding was the Acting Chief Medical Officer for MDOC until his retirement on October 13, 2017.  (Dkt. 138, Exhibit A, Borgerding Requests for Production

---

[1] The "post-verdict" qualifier in the deliberate indifference claim is a reference to Kensu's successful March 28, 2016 verdict against some MDOC personnel, including Dr. Borgerding.  (Dkt. 83, Exhibit 1, Verdict).  He was successful on his deliberate indifference claim in that case, but complicating the analysis in this case, he has not consistently directed the Court to specific evidence in that case illuminating the medical treatment that was at issue in that case.

No. 1).  Haas and Gulick contend that Kensu made no specific allegations as to how either of them denied him medical care or adequate care.  (Dkt. 138, pp. 6-7).  Gulick points out that she is not identified in the complaint with any specific denials of medical care.  Borgerding says he did not provide direct medical care to Kensu.  (Dkt. 138, p. 7).  Instead, Borgerding notes the few times in the medical record where he approved medications and a knee compression sleeve.  (*Id.*; Dkt. 138, Exhibit B, Kensu Medical Records).

Kensu counters that the defendants were aware of his medical conditions and status of treatment, but despite this knowledge and their supervisory positions, they either directly denied needed care or were aware of denials of care and did not see that Kensu received necessary medical treatment.  (Dkt. 151, pp. 7-8).  Kensu also argues that the defendants knew or should have known that he needed treatment for his serious medical needs.  He says that the defendants, in their supervisory capacities, at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct.  (*Id.* at 12).

It is well-settled that a civil rights plaintiff must allege the personal involvement of a defendant to state a claim under 42 U.S.C. § 1983.  *See Monell v. Department of Social Svs.*, 436 U.S. 658, 691-92 (1978) (Section 1983 liability cannot be based upon a theory of *respondeat superior* or vicarious liability); *Everson v. Leis*, 556 F.3d 484, 495 (6th Cir. 2009); *see also Taylor v. Michigan*

8

*Dep't of Corrections*, 69 F.3d 716, 727-28 (6th Cir. 1995) (plaintiff must allege

facts showing that defendant participated in, condoned, encouraged, or knowingly

acquiesced in alleged misconduct to establish liability); *Nwaebo v. Hawk–Sawyer*,

83 Fed. Appx. 85, 86 (6th Cir. 2003) (To recover against a given defendant for a

claimed constitutional violation, the plaintiff "must allege that the defendant [was]

personally involved in the alleged deprivation of federal rights.") (citing *Rizzo v.*

*Goode*, 423 U.S. 362, 373-77 (1976)).  To invoke supervisory liability, a plaintiff

must "show that the [supervisor] at least implicitly authorized, approved, or

knowingly acquiesced in the unconstitutional conduct of the offending

officers."  *Shehee v. Luttrell,* 199 F.3d 295, 300 (6th Cir. 1999) (quoting *Hays v.*

*Jefferson Cnty., Ky.*, 668 F.2d 869, 874 (6th Cir. 1982)).

Kensu has offered scant evidence supporting Haas's supervisory liability for

any denials of care or medical items.  In his affidavit, Kensu said he met with Hass

to discuss his medical issues and "non-treatment," among other things.  (Dkt. 151-

4, ¶ 40).  Kensu stated that Hass "ordered his medical staff and inspector Leduc to

seize the medical items that [Kensu] was pre-approved to receive."[2]  He also says

that PA McKissick told him that Haas was mostly responsible for blocking his

medical items and that Haas told McKissick not to approve anything else.  (*Id.*).

---

[2] By items that were "pre-approved," it appears that Kensu is referring to an email from
Dr. Husain in which the physician said he wanted to approve some of Kensu's special
accommodations requests, discussed more fully below.  (Dkt. 74-13).

However, Kensu has not pointed to any admissible evidence to support his claim.

Instead, he makes statements in an affidavit about what third parties told him about

Haas's alleged actions.  It is not enough.  *See Courtney v. Murphy*, 2012 WL

3966336, at *8, n.2 (E.D. Mich. Sept. 11, 2012) (The plaintiff averred in an

affidavit that one of the defendants "discontinued all medication without even

looking at [his] medical charts or files," but he did not specify how he knew this

information.  The court stated, "Although the statements are contained in an

affidavit, they are ultimately inadmissible at trial as lacking in foundation and,

therefore, insufficient to defeat summary judgment.").  Kensu has not

demonstrated that his sworn statement stems from personal knowledge of any

order by Haas.  As such, the undersigned will not consider this portion of the

averment.  Similarly, Kensu's relaying of the out-of-court statement of non-party

declarant McKissick that Hass told her not to approve anything is inadmissible

hearsay and is not considered here. Fed. R. Evid. 801(d)(2)(A); *North American*

*Specialty Ins. Co.*, 111 F.3d at 1283.  Without the affidavit statements, there

appears to be no record evidence to support Kensu's contention that Haas was

directly involved in the denial of medical care, or that he authorized, approved, or

knowingly acquiesced in any denial or removal of items.  Indeed, all that is left is

the contention that Haas, as Warden, had supervisory authority over MDOC.  But

as discussed, liability cannot attach based solely on a theory of *respondeat*

*superior. See Shehee,* 199 F.3d at 300.  Thus, Haas's motion for summary

judgment should be granted.

There is a question of fact as to whether Gulick was sufficiently personally

involved in Kensu's medical care to subject her to Eighth Amendment liability.

Gulick's alleged involvement stems from a chain of emails about a list of requested

special accommodations Kensu gave to medical staff in April 2016.  (Dkt. 74-3).

The requested special accommodations included: (1) a TENS unit, (2) supportive

high-top boots, (3) a back support belt, (4) inversion boots/clips, (5) a UC

approved heating pad, (6) a wedge pillow, (7) ankle sleeves, (8) elbow sleeves, (9)

a nebulizer, (10) a gluten/dairy/fortified sweetener-free diet, (11)

acidophilus/probiotics, (12) azulfidine/vitamin D/multivitamin, (13)

glucosamine/chondroitin, MSM joint compound, and (14) a detail to purchase

natural health products.  (*Id.*).  After a series of emails between prison officials that

included Dr. Borgerding and Gulick, Dr. Lacy met with Kensu and denied all of

the requests.

The following is a synopsis of the email chain about the requests.  On June

24, 2016, Gulick wrote an email to defendant Bomber stating that the legal

department needed defendant Lacy to document his conversations with Kensu in

the medical record and to address all the accommodations Kensu requested.  (Dkt.

74-9).  On June 30th, non-party Dr. Husain met with Kensu and later emailed Dr.

11

Borgerding stating that he wanted to approve some of the items on the list. (Dkt. 74-13). On July 1st, Gulick wrote an email to Borgerding stating that Bomber had told her that Lacy would address Kensu's list but that they now had additional issues because "someone else got involved." She wanted this "fixed and fixed right." (Dkt. 74-16). On July 7th, Lacy met with Kensu—who left the meeting early on when Lacy indicated that he was going to deny the requests—and denied each of Kensu's requests, including those that Dr. Husain wanted to approve. (Dkt. 151, at p. 14; Ex. 2- Medical records, at p. 1-2).

Kensu says that a reasonable jury could conclude that Gulick encouraged the "specific incident of misconduct" (presumably, the denial of the requests) or at least implicitly authorized, approved, or knowingly acquiesced in the denial of medical care. He is correct. Viewing the facts in a light most favorable to Kensu, there is a question of material fact as to whether she was authorized to direct the medical personnel concerning these accommodations requests since she was in a position of authority. If she had such authority, then there is also a question of material fact whether Gulick's statements in response to Dr. Husain's involvement, that "someone else got involved" and she wanted it "fixed and fixed right" mean that it was her aim to have the requests denied, and thus implicitly authorized or approved the denials. Accordingly, Kensu's claim against Gulick is at least

12

sufficient to raise a question as to whether Gulick was sufficiently personally involved to be subjected to liability.

Kensu's claim of Eighth Amendment liability against Borgerding is more complex. Kensu's primary evidence that Borgerding was involved in denials of care or treatment or knowingly approved or acquiesced in denials is his affidavit. In his affidavit, Kensu says that Nurse Cooper and PA McKissick "continuously identified Defendant Borgerding as one of the primary deniers of almost every aspect of my care" and that Borgerding "blocked others from providing care and only approved sinus medication that another specialist already ordered" for him. (Dkt. 151-4, Kensu Affidavit, ¶¶ 72, 82). Kensu bases his knowledge that Borgerding is a "primary denier" of care on representations by Cooper and McKissick. He does not indicate he has personal knowledge of the underlying facts. As stated above, an affidavit at the summary judgment stage must be based on personal knowledge, otherwise statements made in the affidavit cannot be considered by the court. *See Courtney*, 2012 WL 3966336, at *8, n. 2 (citing *Evans v. City of Chicago,* 434 F.3d 916, 933 (7th Cir. 2006) ("[A]s this court has repeatedly held, the self-serving affidavit of a plaintiff is *ipso facto,* insufficient to create an issue of material fact."); *Fanslow v. Chicago Manuf. Center, Inc.,* 384 F.3d 469, 483 (7th Cir. 2004) ("[A] plaintiff cannot defeat summary judgment by

submitting a self-serving affidavit that contains the bald assertion of the general truth of a particular matter.") (internal citations and quotations omitted)).

Here, Kensu's affidavit statements about Borgerding's denials of care do not constitute evidence rebutting Borgerding's motion for summary judgment on the deliberate indifference claim. Disregarding the affidavit statements that Borgerding is a "primary denier" of care and has told others to deny him care, the Court is left with the few instances in the medical record that appear to show Borgerding granting medication requests and his involvement in the email chain about the special accommodations, discussed above. (Dkt. 138, Ex. B). The medical records available to the Court contain the following entries from Dr. Borgerding: On September 27, 2016, Borgerding approved a knee sleeve. On October 25, 2016, Borgerding deferred non-formulary medications Nasalcrom and Allegra-D, which were requested to treat Kensu's sinusitis, and he discontinued sulfasalazine (because Kensu did not have a diagnosis for which the medication was indicated) and a gluten free diet (because Kensu had negative testing for gluten allergy).[3] Finally, on October 27th, Borgerding approved a nasal steroid but deferred the Nasalcrom and Allegra-D.

---

[3] Dr. Lacy had already denied Kensu a gluten free diet on July 6, 2016 because he tested negative for a gluten allergy. (Dkt. 151-3, p. 1).

Although Borgerding argues that he did not provide Kensu with direct patient care during the time relevant to the complaint, thus defeating any claim of liability for Kensu's Eighth Amendment claims, the medical records indicate that Dr. Borgerding deferred, and thus kept from Kensu for at least some period of time, the medications requested to treat Kensu's sinusitis.  Hence, Borgerding was at least involved in denying medications to treat sinusitis.  As to the gluten free diet, the need for this diet is not one of the medical conditions Kensu asserts in his amended complaint or response brief to support his claim of deliberate indifference.  Thus, Borgerding's denial of the gluten free diet does not subject him to liability.  Similarly, Borgerding's discontinuance of the medication sulfasalazine should not subject him to liability since the deferral of this medication is not part of Kensu's claim, there should be no liability attached to discontinuing the medication.  Even though his denial of the gluten-free diet and discontinuation of sulfasalazine cannot form the basis for personal involvement here, Borgerding's argument that he was not sufficiently personally involved with Kensu's care falls short as regards Kensu's sinusitis.  This condition, and Borgerding's potential liability for deliberate indifference, are discussed below.

Borgerding was also involved in the email chain discussed above.  There is an email from Gulick to Borgerding in which Gulick stated she wanted Dr. Lacy to see Kensu about his list of requested accommodations.  Borgerding responded to

the email stating that Lacy was completing his follow-up visit and that all the items in the list would be addressed and documented in the medical record. (Dkt. 74-16). There is an email, dated July 1, 2016, from Borgerding to Bomber and Lacy in which he asks them to have someone see Kensu and assess him for the requests on his list. He also indicated that the assessment should be entered into the medical record for each request including the determination of whether the request would be granted and why or why not. He said he could not be part of that process. (Dkt. 74-14). The email chain on the requested accommodations does not demonstrate how Borgerding was either directly involved in the denial of the accommodations or that he approved, authorized or knowingly acquiesced in the denials. His involvement in the list of requests appears to be entirely before the requests were denied, and was merely administrative, explaining to the doctors what should be documented in the medical record. His email response to Gulick merely stated that Dr. Lacy would be seeing Kensu to address the list; he did not say that he told Dr. Lacy to deny the requests or to deny medical care, nor did he say anything of the sort in his email to Dr. Lacy. Kensu has not demonstrated that Borgerding encouraged or implicitly authorized or approved the denial of the accommodations such that his personal involvement can be established. Therefore, liability should not attach to Borgerding regarding the denial.

b.      Deliberate Indifference

As noted above, Kensu listed the following nine medical conditions in his amended complaint that form the basis for his deliberate indifference claim: (1) prostate disease, (2) lung disease, (3) hearing loss, (4) mastoiditis, (5) extreme heat sensitivity, (6) brain tumor, (7) spinal disease, (8) ankle problems, and (9) shoulder problems. (Dkt. 83, ¶ 128). According to Kensu, this list is not exhaustive. (Dkt. 152, p. 17).[4] The Corizon defendants, Drs. Bomber and Lacy, limited their opening brief to these nine conditions. In response to the Corizon defendants, Kensu addressed only the following conditions: prostate disease, lung disease, denervation, severe combined immunodeficiency (SCID), spinal disease, ankle problems, and shoulder problems.[5] (Dkt. 152). He states, however, that he is not conceding that unmentioned conditions were appropriately treated. (*Id.* at 17). Kensu references an exhibit which lists all of his medical conditions, totaling 28 conditions, nine of which are listed in the complaint. Since the parties provided argument on the nine conditions and on denervation and SCID only, the Court limits its analysis to only those conditions. For the remaining conditions, Kensu pointed to pages in the medical records which contain the diagnoses for the

---

[4] Kensu cites no authority for the proposition that he is permitted to pursue open-ended claims not identified in his complaint. Indeed, such a practice would appear to flout the pleading standard set forth in Fed. R. Civ. P. 8(a) and create a moving target for the defendants to defend against.

[5] There is no mention of denervation or SCID in the amended complaint.

conditions, (Dkt. 151-2, Pg ID 5084), but provided no argument on the conditions demonstrating that the defendants were deliberately indifferent to his care with respect to the same.  It is not for the Court to craft arguments for the parties on the additional medical conditions.  *See*, *e.g.*, *Canning v. FCA US LLC*, 2017 WL 4918521, at *6 (E.D. Mich. Oct. 31, 2017) (citing *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997)).

c.     Standard for Liability

In the context of medical care, a prisoner's Eighth Amendment right to be free from cruel and unusual punishment is violated only when the prisoner can demonstrate a "deliberate indifference" to his serious medical needs.  *Estelle v. Gamble*, 429 U.S. 97, 104-06 (1976).  "Where a prisoner has received some medical attention and the dispute is over the adequacy of treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims that sound in state tort law."  *Westlake v. Lucas*, 537 F.2d 857, 860 n. 5 (6th Cir. 1976) (citations omitted).  Moreover, mere negligence in identifying or treating a medical need does not rise to the level of a valid mistreatment claim under the Eighth Amendment.  *Estelle*, 429 U.S. at 106.

A viable Eighth Amendment claim has two components, one objective and the other subjective.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2002).  A court considering a prisoner's

18

Eighth Amendment claim must ask both if the alleged wrongdoing was objectively

harmful enough to establish a constitutional violation and if the officials acted with

a sufficiently culpable state of mind. *Hudson v. McMillian*, 503 U.S. 1, 8 (1992).

Under the objective component, "the plaintiff must allege that the medical

need at issue is 'sufficiently serious.'" *Farmer*, 511 U.S. at 834. Courts recognize

that "[b]ecause routine discomfort is part of the penalty that criminal offenders pay

for their offenses against society, only those deprivations denying the minimal

civilized measure of life's necessities are sufficiently grave to form the basis of an

Eighth Amendment violation." *Hudson*, 503 U.S. at 8 (internal citations and

quotation marks omitted). Similarly, "[b]ecause society does not expect that

prisoners will have unqualified access to health care, deliberate indifference to

medical needs amounts to an Eighth Amendment violation only if those needs are

'serious.'" *Id.* at 9. A plaintiff can demonstrate that a medical need is sufficiently

serious by showing that it is "'one that has been diagnosed by a physician as

mandating treatment or one that is so obvious that even a lay person would easily

recognize the necessity for a doctor's attention.'" *Baynes v. Cleland*, 799 F. 3d

600 (6th Cir. 2005) (quoting *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008));

*see also*, *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 897 (6th Cir. 2004). The

plaintiff can also establish the objective component by showing that the prison

provided treatment "so cursory as to amount to no treatment at all." *Dominguez v.*

*Correctional Med. Servs.*, 555 F.3d 543, 551 (6th Cir. 2009). But when a prisoner

has received on-going treatment and claims that this treatment was inadequate, the

objective component requires a showing of care "so grossly incompetent,

inadequate, or excessive as to shock the conscience or to be intolerable to

fundamental fairness." *See Miller v. Calhoun Cty.*, 408 F.3d 803, 819 (6th Cir.

2005) (quoting *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989)). As the

Sixth Circuit recently explained in *Rhinehart v. Scutt*, 894 F.3d 721, 737-38 (6th

Cir. 2018),

> The plaintiff must present enough evidence for a
> factfinder to evaluate the adequacy of the treatment
> provided and the severity of the harm caused by the
> allegedly inadequate treatment. There must be "medical
> proof that the provided treatment was not an adequate
> medical treatment of [the inmate's] condition or pain."
> *Santiago v. Ringle*, 734 F.3d 585, 591 (6th Cir. 2013).
> This will often require "expert medical testimony ...
> showing the medical necessity for" the desired treatment
> and "the inadequacy of the treatments" the inmate
> received. *Anthony v. Swanson*, 701 F. App'x 460, 464
> (6th Cir. 2017); *see Pearson v. Prison Health Serv.*, 850
> F.3d 526, 535 (3d Cir. 2017) (explaining that adequacy-
> of-care claims may require expert testimony "to create a
> genuine dispute that the prisoner's medical needs are
> serious"). The plaintiff also must "place verifying
> medical evidence in the record to establish the
> detrimental effect" of the inadequate treatment.
> *Blackmore*, 390 F.3d at 898 (quoting *Napier v. Madison
> Cty., Ky.*, 238 F.3d 739, 742 (6th Cir. 2001)); *cf. Broyles
> v. Corr. Med. Servs., Inc.*, 478 F. App'x 971, 975 (6th
> Cir. 2012) (holding that defendant had "met this
> requirement" at the motion-to-dismiss stage "by alleging

statements by [doctors] linking the delay in treatment to
the permanency of his vision impairment").

The subjective component requires that the defendant act with deliberate
indifference to an inmate's health or safety. *Farmer*, 511 U.S. at 834. Deliberate
indifference "entails something more than mere negligence," *Farmer,* 511 U.S. at
835, but can be "satisfied by something less than acts or omissions for the very
purpose of causing harm or with knowledge that harm will result." *Id.* To
establish the subjective component, "the plaintiff must allege facts which, if true,
would show that the official being sued subjectively perceived facts from which to
infer substantial risk to the prisoner, that he did in fact draw the inference, and that
he then disregarded the risk." *Id.* at 837. In other words, this prong is satisfied
when a prison official acts with criminal recklessness, i.e., when he or she
"consciously disregard[s] a substantial risk of serious harm." *Brooks v. Celeste*, 39
F.3d 125, 128 (6th Cir. 1994) (citing *Farmer*, 511 U.S. at 839-40). A plaintiff may
rely on circumstantial evidence to prove subjective recklessness: A jury is entitled
to "conclude that a prison official knew of a substantial risk from the very fact that
the risk was obvious." *Farmer*, 511 U.S. at 842. And if a risk is well-documented
and circumstances suggest that the official has been exposed to information so that
he must have known of the risk, the evidence is sufficient for a jury to find that the
official had knowledge. *Id.* at 842–43. "But the plaintiff also must present enough
evidence from which a jury could conclude that each defendant 'so recklessly

ignored the risk that he was deliberately indifferent to it.'"   *Rhinehart*, 894 F.3d at

738 (quoting *Cairelli v. Vakilian*, 80 Fed. Appx. 979, 983 (6th Cir. 2003)).

> d.     Prostate Disease

Much of the medical evidence Kensu relies on for this claim pre-dates the

March 2016 verdict.  While not entirely clear, it does not appear that prostate

issues were part of the prior case and verdict.  Thus, medical records on the

condition before the verdict are relevant to this claim.  Kensu claims he began

complaining of prostate and urinary disorders to Dr. Bomber as early as "2003-

2005" through 2014.  (Dkt. 151-4, ¶ 78).  In 2014, a CT confirmed that he had an

enlarged prostate, but no one told him of this finding.  (*Id.*).  Kensu's prostate

issues appear in the medical records available to the Court starting on August 13,

2015.  (Dkt. 142, Exhibit E to Corizon Defendants' brief, Pg ID 3560).  In this first

record, Dr. Crompton noted that the onset of genitourinary symptoms had started

"a few years ago."  He diagnosed Kensu with enlarged prostate, and prescribed

Flomax.  (*Id.* at Pg ID 3560-61).  On August 27, 2015, Kensu asked to try a

different medication, so Dr. Crompton wrote a prescription for "Hytrin."  (*Id.* at Pg

ID 3564).  In September 2015, Kensu received non-formulary medication

Finasteride for the condition.  (*Id.* at Pg ID 3569).  On February 1, 2017, PA

McKissick found that the three medications that had been tried up to that point—

Proscar/Finasteride, Hytrin, and Flomax—had "failed."  (*Id.* at Pg ID 3572).

22

McKissick submitted a request for Cardura.  (*Id.* at Pg ID 3575).  Dr. Borgerding

deferred the Cardura, and requested that formulary alternatives be used first.  (*Id.*

at Pg ID 3577).  Kensu continued to experience symptoms from the prostate

disease, (*Id.* at Pg ID 3578-82), and in June 2017, he requested a different

medication because the medications he tried were not working.  On September 28,

2017, Dr. Lacy approved the non-formulary medication Tadalafil, which Kensu

received in its non-generic form, Cialis (*Id.* at Pg ID 3590, 3593-94, 3596-3600)

for six months, which became the subject of a motion for temporary restraining

order filed by plaintiff in April 2018.  (Dkt. 101).[6]  At that time, Kensu was the

first and only prisoner in Michigan prescribed this drug to treat the condition.

(Dkt. 106 – Hearing Transcript, at p. 80).  The Cialis worked to treat his condition.

Based on the numerous health provider visits and medications tried to treat

his prostate disease since his diagnosis in August 2015, a reasonable jury could not

conclude that Kensu's prostate disease was left untreated or that his medical care

for the condition was so cursory as to amount to no treatment at all.  Thus, Kensu's

claim regarding this condition is an adequacy of care claim.  "To go on to trial,

[Kensu] must show that there is a genuine issue of fact over the adequacy of the

---

[6] The motion for injunctive relief was originally filed to reinstate Cialis because the prescription had lapsed.  Shortly after he filed the motion, the medication was reinstated, but with a restriction that required Kensu to get his daily dose from the medline.  His argument for injunctive relief evolved into the issue of the restriction.  The motion was denied.  (Dkt. 146).

care [he] received and that he suffered a verified medical injury because of the inadequate treatment." *Rhinehart*, 894 F.3d at 739-40 (citation omitted).  Again, this type of claim requires a showing of care "so grossly incompetent, inadequate, or excessive so as to shock the conscience," *Miller v. Calhoun Cty.*, 408 F.3d 803, 819 (6th Cir. 2005), and the plaintiff must present "medical proof that the provided treatment was not an adequate medical treatment" for the conditions. *Santiago v. Ringle*, 734 F.3d 585, 591 (6th Cir. 2013).  As stated in *Rhinehart*, a prisoner's "disagreement with the testing and treatment he has received . . . does not rise to the level of an Eighth Amendment violation."  894 F.3d at 740 (quoting *Dodson v. Wilkinson*, 304 Fed. App. 434, 440 (6th Cir. 2008).  Nor does "a desire for additional or different treatment . . . suffice to support an Eighth Amendment claim."  *Id.* (quoting *Anthony v. Swanson*, 701 Fed. Appx. 460, 464 (6th Cir. 2017).

Kensu's medical records show that his prostate-related concerns were addressed once the condition was diagnosed and that medical personnel adjusted his medication after complaints of side effects or ineffectiveness.  In all, the medical providers tried three medications in the year before the Cialis, which ultimately worked to alleviate all of his symptoms.  Kensu has not proffered any medical evidence to suggest that the care he received up to the point of the Cialis prescription was so inadequate as to "shock the conscience."  To be sure, Kensu disagrees with the course of treatment he received before receiving the Cialis, but

such disagreement with a course of treatment does not rise to the level of a constitutional violation; nor does negligent medical care. *Rhinehart*, 894 F.3d at 740.  When, as here, a prisoner "received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims that sound is state tort law." *Graham v. Cnty. of Washtenaw,* 358 F.3d 377, 385 (6th Cir. 2004) (quotation omitted).  Furthermore, the fact that "alternative procedures might have better addressed [a prisoner's] particular needs" does not show deliberate indifference. *Id.* at 384.

Even if the Court were to conclude that Kensu's prostate disease treatment rose to the level of objective deliberate indifference, Kensu cannot establish that Drs. Lacy and Bomber were deliberately indifferent to his prostate care.  According to Kensu, during the time he was taking the ineffective medication, both Bomber and Lacy were aware of his "suffering."  (Dkt. 152, p. 18).  He says he filed five kites about the delay in receiving effective medication, but does not specify to whom the kites were sent.  (*Id.*).  Notably, neither defendant was listed in the medical records regarding prostate disease.  As to Dr. Lacy, there are no facts in the record showing that he drew an inference of a risk of harm to Kensu on the "ineffective" medication, and that he disregarded any such risk.  Indeed, whatever involvement Dr. Lacy had with Kensu's prostate issues is unclear.  Dr.

Bomber, on the other hand, was apparently aware of facts from which to infer a serious risk and he drew the inference.  Dr. Bomber was the physician who overrode Dr. Coleman's deferment of Cialis and reinstated the drug.  (Dkt. 106, pp. 66-67).  Since he reinstated the drug, it follows that he inferred or was otherwise aware there was a risk of harm to Kensu without the drug.  However, having reinstated the drug, it does not appear that Bomber disregarded medical risk.  Thus, on this record, the undersigned concludes that a reasonable jury could not conclude that the defendants were deliberately indifferent to Kensu's prostate disease.

e.      Lung Disease

The relevant time period to consider Kensu's lung issues is not entirely clear.  He points to his affidavit in which he avers, without specificity, that he had been receiving inhalers for his lungs since the 1990s, but also that medical personnel had taken away his inhalers.  (Dkt 151-4, ¶ 81).  He also averred that it was not until he filed this lawsuit that he was given Albuterol, Alveso and Singulair for his asthma.  (*Id.*).  His diagnosis of asthma is noted in the records from January and February 2015; it was noted to be stable without medication.  (Dkt. 151-3, pp. 29, 34).  A medical record dated February 15, 2017 contains a respiratory note that Kensu was positive for chronic cough, cough, and difficulty breathing.  (Dkt. 151-3, p. 21).  Later in that same record, PA McKissick noted that his lungs were clear to auscultation and percussion, that there was no cough, and

that his respiratory effort was normal.  (*Id.* at 22).  On January 13, 2017, he was

positive for difficulty breathing, but his lungs were clear to auscultation and

percussion, no cough, and respiratory effort was normal.  (*Id.* at 67).  In July 2017,

non-party Dr. Coleman deferred a prescription for Singulair because Kensu was

taking Claritin.  (Dkt. 141, Ex. C, p. 41).  Dr. Coleman wanted to try one new

medication first.  Bomber and Lacy cite medical records showing non-defendant

physicians requested and approved spirometry testing in April 2018, but this

testing occurred well after the filing of the amended complaint thus rendering it of

questionable relevance here.  (Dkt. 140, p. 12; Exhibit C, pp. 53-54).

Although medical evidence on the lung issues begins in February 2017,

Kensu argues that he was made to wait from March 2016 through April 2018 for

treatment.  (Dkt. 152, p. 19).  Given this statement by Kensu, the undersigned will

consider the relevant period regarding the defendants' actions to be from the

March 28, 2016 verdict through the filing of the amended complaint, October 9,

2017.

Kensu has established that he had an objectively serious medical need with

regard to his asthma.  Asthma was a condition diagnosed by a physician as

mandating treatment.  *See Baynes v. Cleland*, 799 F. 3d 600, 618 (6th Cir. 2005).

Kensu at one time was prescribed inhalers and other medications for his lung

issues, but he says the inhalers were taken away.

27

Although Kensu's lung issues likely satisfy the objective component, the claim does not satisfy the subjective component.  If Bomber and Lacy were aware of complaints through grievances filed against them (as Kensu says in his affidavit), there are no facts in the record demonstrating that either defendant drew an inference of risk to Kensu and deliberately disregarded the risk.  In support of the subjective component of the claim, Kensu points to Dr. Lacy's denial of all of his requests for special accommodations to demonstrate that the defendants were aware of his issues yet deliberately ignored them.  One of his requests for special accommodations was for a nebulizer.  Dr. Lacy denied the request because it was not medically necessary and because there was a nebulizer in healthcare available to the prisoners 24 hours a day; thus, obviating the need for a personal nebulizer. (Dkt. 151-3, p. 1).  Since Kensu apparently had access to a nebulizer 24 hours a day, it is unclear how a reasonable jury could conclude that Dr. Lacy's denial of a personal nebulizer amounted to deliberate indifference.  Consequently, the claim should be dismissed.

> f.      Spinal Disease and Ankle Problems

Kensu argues that his treatment for these conditions demonstrates deliberate indifference to his medical needs because Dr. Lacy, with the consent of Dr. Bomber and others, denied his requests for special accommodations.  Kensu says that a reasonable jury could conclude that the removal of his accommodations as

well as the delay in receiving more substantial treatments shows deliberate indifference.  (Dkt. 152, p. 20).

The undersigned will address the ankle issues first.  Kensu does not clearly define the relevant period for the medical evidence.  Since Kensu's argument is based on the denial of special accommodations in July 2016, it would seem the relevant period ends at the time Lacy denied the accommodations.  When the period begins is less clear, but is also immaterial since there are no records on his ankles within three years before the accommodations were denied.  The medical evidence referencing his ankles from before July 2016 far predates the March 2016 verdict—from 2003 to 2005.[7]  Kensu also points to a radiology report from January 2018 showing mild arthritic changes in both ankles, mild soft tissue swelling in the left ankle, and a tiny spur in the right ankle.  (Dkt. 151-3, at p. 44).  However, there is no evidence to suggest that the issues from 2005 and January 2018 had any bearing on the condition of his ankles in the time before Dr. Lacy denied the accommodations in July 2016.  Consequently, there appears to be no medical evidence from the relevant period on his ankles at all, let alone evidence

---

[7] The evidence from this time shows plantar calcaneal spurs and a few bone fragments in the posterior aspect of the left talus bone.  It was believed then that these issues resulted from a previous trauma and could be managed with NSAIDs; the issues did not warrant special shoes. (Dkt. 151-3, at p. 57).  In November 2005, a nurse noted pain in his ankles and the soles of his feet with ambulation and gave him gel insoles.  (Dkt. 151-3, p. 50).

that would suggest that he had a serious medical need for which he was not treated, or that any treatment he received was inadequate.

Regarding his spinal problems, the medical records begin November 2015. Accordingly, the relevant period for his spinal problems appears to be from November 2015 through the cancellation of the accommodations in July 2016. On November 12, 2015, Kensu presented to healthcare requesting treatment for his back symptoms. Kensu complained of excruciating pain from his neck to the base of the lumbar spine that started when he was in his 20s. He reported that his symptoms somewhat improved with a wedge pillow, hot water bottle, and a TENS unit, and that NSAIDs were beneficial. (Dkt. 151-3, p. 60). It is unclear what, if any, care he received for his back at this visit because Kensu provided only page 1 of 3 of this medical record. A radiology report from November 2016 showed degenerative arthritic changes in both the cervical and lumbar spine. (Dkt. 151-3, p. 62).

The only medical evidence Kensu relies on is a radiology report from 2018, which is beyond the relevant period. And, as with his ankle issues, Kensu has not come forward with other medical evidence that would suggest that the issues found in the 2018 radiology testing were present in 2016. Thus, the Court is left with a 2015 medical record in which he reported that his condition improved with some accommodations and pain medication that he had access to at that time. Of course,

30

Dr. Lacy denied the requests for a TENs unit and wedge pillow, stating that neither were medically necessary.  (Dkt. 151-3, p. 1).  Kensu disagrees with Dr. Lacy.  As noted above, however, a difference of medical opinion, or even negligent medical care, does not give rise to a constitutional violation.  Moreover, Kensu has not provided evidence to establish a detrimental effect of the treatment he received for his spine or that the denial of the TENs unit and wedge pillow amounted to care so grossly inadequate as to shock the conscience.  *See Rhinehart*, *supra*.  In addition to his claim that the denial of the accommodations constitutes deliberate indifference, Kensu also says that the "delay in receiving more substantial treatments constitutes deliberate indifference."  (Dkt. 152, p. 20).  But Kensu neither suggests what constitutes "more substantial" treatment nor provides medical evidence that "more substantial" treatments *should* have been given.  Accordingly, the undersigned suggests that no reasonable jury could conclude that Kensu has satisfied the objective component of his claim on his ankle and spine problems.

Furthermore, even if Kensu satisfied the objective component for both his ankles and spine, he does not satisfy the subjective component.  Kensu has not shown that Drs. Bomber and Lacy disregarded a serious risk of harm.  Dr. Bomber's only involvement in the denial was to acknowledge, via email, that Dr. Lacy planned to meet with Kensu about the list of requests and that he would

notify Gulick when the meeting was complete.  (Dkt. 74-9).  There is no suggestion that, even if one could infer a risk of harm to Kensu from the denial of the accommodations, Dr. Bomber drew such an inference and disregarded such a risk.

Likewise, Kensu has not established that Dr. Lacy consciously disregarded a risk.  Dr. Lacy explained why he denied each request, often citing lack of medical necessity or lack of support for the use of the accommodation in medical literature.  (Dkt. 151-3, pp. 1-2).  Dr. Lacy denied the request for ankle sleeves because he concluded they are not medically necessary.  He said they "do not provide additional support and there is no evidence that they reduce pain.  They have no chronic medical use that I am aware of."  (*Id.*).  Kensu points to the testimony of Nurse Cooper and PA McKissick in rebuttal.  PA McKissick testified that she disagreed that there was no medical evidence that ankle sleeves reduce pain.  (Dkt. 151-12, p. 136).  She said ankle sleeves are for short-term use to reduce mobility after an injury.  Reducing mobility would reduce inflammation and help the healing process, which would reduce pain.  (*Id.* at 137).  Nurse Cooper testified that she could not think of any medical reason why Kensu should not have ankle sleeves if he was complaining of ankle pain.  (Dkt. 151-8, pp. 53-54).

It is true that "prison officials may not entirely insulate themselves from liability under § 1983 simply by providing some measure of treatment," and that

rendering "grossly inadequate care" or making the "decision to take an easier but less efficacious course of treatment" can amount to deliberate indifference.  *Jones v. Muskegon Cnty.*, 825 F.3d 935, 944-46 (6th Cir. 2010).  In this case, however, there is no evidence to suggest that the denial of a TENs unit, back support belt, wedge pillow, and supplements amounted to "grossly inadequate care," especially considering Kensu reported symptom alleviation with medication and a hot water bottle, both of which he still had access to when Dr. Lacy denied the accommodations.  Similarly, there is no evidence suggesting that Dr. Lacy chose to take an easier, but less efficacious course of action when he denied the TENs unit, back support belt, supportive high-top boots, and other items.  To the extent Kensu, McKissick and Cooper disagree with the denial of ankle sleeves, again, disagreement in course of treatment, without more, does not establish a constitutional violation, nor does negligent medical care.  Furthermore, Cooper's statement that she saw no medical reason why Kensu should not have the ankle sleeves does not demonstrate that declining to give him the ankle sleeves exhibits a disregard of a risk of harm to Kensu's ankles.

g.    Hearing Loss and Mastoiditis[8]

Kensu did not provide any argument on these conditions.  Dr. Borgerding, as

noted above, deferred medications Nasalcrom and Allegra-D in October 2016,

pending further information, but approved a nasal steroid.  (Dkt. 138-3, Pg ID

3270-71).  Drs. Bomber and Lacy chronicle the care Kensu has received relating to

his hearing loss and mastoiditis.  (Dkt. 140, pp. 12-14).  In June 2017, PA Farris

addressed his chronic mastoiditis and started him on prednisone to provide some

relief.  (Dkt. 142, Pg ID 3587).  Kensu had an outside ENT consultation at Henry

Ford Allegiance Hospital for sinusitis, mastoiditis, and hearing loss complaints on

July 17, 2017.  (Dkt. 143, Ex. F).  An audiogram showed bilateral sensorineural

hearing loss "with excellent word recognition ability and normal tympanograms."

No recommendations were made with regard to the hearing loss.  (*Id.* at Pg ID

3622).  For his chronic sinusitis, the physician found no acute infection but

recommended further testing for possible surgical planning.  (*Id.*).  The physician

further recommended a trial of Singulair instead of Claritin and Rhinocort instead

of Flonase for Kensu's rhinitis.  (*Id.* at Pg ID 3622).  An ENT follow-up was

approved on July 27, 2017.  (Dkt. 141, Ex. C, p. 38).  Also on the 27th, Dr.

Coleman approved the recommendation for Nasalcrom, but deferred Singulair and

---

[8] The Corizon defendants also discuss Kensu's sinusitis under this same heading.  Since these conditions are apparently related, the undersigned will also address sinusitis.

34

Rhinocort, stating that they should try one drug at a time.  (*Id.* at 41).  The remaining medical evidence is from after Kensu filed the amended complaint, and is therefore largely irrelevant to his claims therein.

Based on the medical records, it appears that Kensu's ear and mastoid issues had been treated up to the filing of his complaint, and that the treatment was not so cursory as to amount to no treatment at all.  He was given prednisone, an ENT consultation, a nasal steroid, and began new medication within a two-month time period after the ENT consultation.  Kensu's claim does not progress past the objective component because there is no evidence in the record establishing that the treatment provided up to the filing of the amended complaint was not adequate treatment for the condition, and there is no verifying medical evidence to establish the detrimental effect of the treatment.  *See Rhinehart*, *supra*.  Indeed, Kensu makes no argument at all that the treatment was inadequate. His burden at this stage, however, is to come forward with evidence showing a genuine issue of material fact on the care he received for these conditions.  He has not met his burden.  The claim should fail as to these conditions.

### h.    Heat Sensitivity

Kensu makes no argument specifically supporting his claim of deliberate indifference to his heat sensitivity, and the record does not support such a claim. On August 12, 2016, Nurse Cooper evaluated Kensu for heat-related illness.  He

stated that he was exposed to heat in his housing unit 12 hours before a visit with Cooper and that he previously experienced heat stroke 40 years prior. Cooper found no abnormal signs in Kensu. (Dkt. 151-3, at p. 5). She gave him a detail for "meals in" for three days. He was instructed to return to healthcare if his symptoms persisted or worsened. (Dkt. 151-3, at p. 4). It appears he did not return to healthcare again with complaints of heat stroke or heat sensitivity.

The record shows Kensu complained of heat-related illness, was seen within 12 hours of the onset, and was given a detail for meals in. It is not clear on what basis Kensu believes there was deliberate indifference here. His medical need was treated promptly, and he makes no argument that the care he received was inadequate. Indeed, since Kensu did not return to healthcare or argue inadequacy, it would seem that his treatment on August 12th was adequate. For these reasons, his claim does not satisfy the objective component. Further, these facts do not raise the possibility that Drs. Bomber and Lacy were deliberately indifferent to his heat sensitivity. Thus, the subjective component fails as well.

i.    Brain Tumor

On May 22, 2017, Kensu had an MRI of his brain at Henry Ford Allegiance Health. The MRI findings were normal except for a 5mm right intraventricular lesion. The physician recommended a follow-up examination in six months. (Dkt. 151-3, pp. 71-72). Kensu presented to MDOC healthcare on May 26, 2017,

complaining of headaches for the past seven months, gradually worsening over the preceding three months. The medical personnel provided an overview of the Henry Ford MRI findings. (Dkt. 141, p. 33). Dr. Pappendick approved a neurosurgery consultation on May 30, 2017. (*Id.* at 34). However, on the date of the consult, June 23, 2017, Kensu refused to attend because he wanted to go to U of M hospital, not Allegiance. (*Id.* at 36). So, on October 3, 2017, Kensu was seen at U of M for evaluation of the lesion. (Dkt. 144, Ex. E, p. 4). The physician reviewed the MRI taken May 22, 2017. The physician concluded that Kensu had a 2mm[9] non-contrast enhancing lesion consistent with subependymoma. The lesion was characterized as benign and unlikely to cause hydrocephalus, and the physician assured that the lesion was not associated with Kensu's tinnitus or migraine. Finally, the physician concluded that surgical intervention was not indicated. Instead, he recommended that the lesion be monitored with MRIs, and scheduled Kensu for another MRI in November. If the lesion was stable, Kensu would advance to yearly MRIs. (Dkt. 144, p. 6). On November 22, 2017, Kensu presented to Henry Ford for a follow-up MRI. The lesion was unchanged from the last MRI; it was still 5mm large. The physician recommended a follow-up MRI in six months. (*Id.* at 1-2).

---

[9] There is no explanation for the difference in size of the lesion found by the two physicians reviewing the MRI, i.e. 2mm versus 5mm.

This is another example of Kensu receiving care for a medical condition, and the care was not cursory.  Kensu provides no argument to demonstrate that the treatment he received for this condition was inadequate or detrimental.  In fact, the medical records show nothing of the sort.  His lesion remained unchanged and there is no indication that it has since changed or worsened.  Because there was no change in the lesion between May and November 2017, there can be no claim that the care in between the MRIs taken in those months was detrimental to the lesion. For these reasons, the claim fails on the objective component.  And since there is no argument or facts in the record demonstrating how any of the defendants were deliberately indifferent toward his brain lesion, the claim also fails the subjective component.

j.       SCID and Denervation

In the briefing, Kensu argues that the delay in sending him to a rheumatologist to treat these conditions constitutes deliberate indifference. However, he did not plead deliberate indifference for either of these two conditions in his amended complaint.  Since these conditions are not of the basis on which Kensu seeks relief in the amended complaint, the conditions should not be considered.  *See Odom v. Hiland*, 2013 WL 4045367, at *2 (W.D. Ky. Aug. 8, 2013) ("The Court does not consider any issues not raised in the complaint to be part of the instant action.").  Further, and notably, he was not diagnosed with these

38

conditions until January and April 2018, after he filed the amended complaint.  In

his response brief, he says he complained of symptoms from these conditions for

"quite some time," and grieved the failure to treat his symptoms, yet there were

significant, months-long delays in seeing a rheumatologist.  (Dkt. 152, p. 19).

However, without some indication from Kensu about what symptoms he suffered,

the undersigned cannot say whether he pleaded any facts regarding the symptoms

or that the medical records contain complaints of those symptoms.  In short, since

he did not plead these conditions, the Court should not consider them.

k.      Shoulder Problems

According to Kensu, his shoulder issues were part of a prior case in which

he won a jury verdict in March 2016 on deliberate indifference to his serious

medical needs.  Kensu's argument in this case is that since the jury verdict, he has

not received any care for his shoulders; specifically, he has not received an

orthopedic consultation or other treatment.  And, since a jury found his shoulder

care prior to March 2016 to be deliberately indifferent, then the lack of care he has

received since the verdict also amounts to deliberate indifference.  In his prior case,

*Kensu v. Steive, et. al.*, Case No. 13-10279, at docket no. 7-1, Kensu made a

number of allegations regarding the care he received for his shoulder conditions.

Kensu suffered a series of shoulder tears after an initial injury in 1998 that went

untreated, and re-injured his shoulders in 2009, which again went untreated.  (Case

No. 13-1279, Dkt. 7-1, ¶ 35).   He claimed that his shoulders never healed properly because his shoulder injuries were not treated.  He suffered constant pain, was unable to fully use or move his arms without popping, partial dislocations, crunching, grinding, and often excruciating pain, but he was denied treatment.  (*Id.* at ¶ 36).  He also claimed that he should not have been prescribed the antibiotic Cipro, because that drug was known to cause degradation and damage to ligaments, joints, and tendons.  The Cipro exacerbated the damage Kensu already had.  (*Id.* at ¶¶ 58-66).  Yet, when the defendants became aware of the damage Cipro could cause, they did not tell Kensu and refused to allow surgery to repair damage in his shoulders.  (*Id.* at ¶ 70-73).  He alleged that it took fourteen months after a 2003 shoulder tear to get an MRI (which showed significant damage to his shoulder) and that for three months after the re-injury in 2009, he did not receive pain medication, ice, or support, and defendants placed false notes in his medical file indicating that he was faking the pain to get medication.  (*Id.* at ¶¶ 67, 76).  He finally met with a surgeon who diagnosed torn rotator cuffs in both shoulders, possible separation and other damage in the right shoulder, and at least 30% of the supraspinatus tendon was shorn in the left shoulder.  (*Id.* at ¶ 79-30).  He alleged that the surgeon said his left shoulder be rebuilt entirely, but prison medical personnel ignored the recommendation.  (*Id.* at ¶ 81).

On March 28, 2016, a jury found that some of the medical defendants in *Stieve* were deliberately indifferent to Kensu's serious medical needs.  (Case No. 13-10279, Dkt. 139, 141).  Six months later, Kensu filed this case alleging that he still had not received any medical care for his shoulders and no orthopedic consultation since the March 2016 verdict.  (Dkt. 1).  Kensu contends that his shoulder issues have remained unchanged since the verdict.  And the medical evidence shows that he continued to have problems.  On August 12, 2016, when Kensu presented to healthcare complaining of heat sickness, the doctor noted his additional complaints of shoulder pain and general musculoskeletal pain with no new symptoms.  (*Id.* at 28).  In September 2016, Kensu sent a kite to healthcare inquiring when he could expect an orthopedic consult for his knee and shoulders, as he had recently won a jury verdict on the issue.  (Dkt. 151-3, p. 12).  The response indicates that PA McKissick had submitted a request for the consult the previous month, but the request was deferred.  He was scheduled to see a facility doctor to discuss an alternative treatment plan received from Corizon.  (*Id.*).  On January 13, 2017, he presented with complaints of ankle pain and bilateral shoulder pain, as well as other conditions.  PA McKissick conducted a physical examination/shoulder evaluation.  Although he was complaining of pain, he was continuing to lift weights at that time.  (Dkt. 151-3, pp. 66-68).  Kensu's range of motion in his right shoulder was normal and pain-free in both the active and

41

passive state.  His left shoulder had normal, passive pain-free range of motion but

active, painful range of motion with limiting factors of pain.  He was assessed with

acute "GH instability" and "Recur Sublux-Dislocation."  The plan was for Kensu

to continue taking the pain medication Naprosyn and to use a hot water bottle on

the affected areas.  (*Id.* at 69).  However, Kensu claims that his Naprosyn and hot

water bottle were taken from him during this litigation.  (Dkt. 151-4, ¶ 61).

Bomber and Lacy do not refute this claim and have offered no evidence that there

was either no longer a medical need for the water bottle and Naprosyn or that he

was provided some alternative form of treatment.  The medical records indicate

that he had access to both treatments at least as late as January 2017, (Dkt. 151-3,

pp. 66-70), and had access to Naprosyn alone until at least July 2017.  (Dkt. 141, p.

41).

Viewed in the light most favorable to Kensu, his shoulder condition

remained unchanged,[10] and thus, there is a question of material facts as to whether

his conservative treatment—hot water bottle and pain medication—was such

cursory treatment that it amounted to no treatment at all.  *See Rhinehart*, *supra*.

The care he received in his prior case—consultation with a surgeon, pain

medication, an MRI, and various visits with medical providers—was found to be

---

[10] Notably, defendants' expert Dr. Drouillard opined that surgical intervention was not
indicated for Kensu's left shoulder.  (Dkt. 140-8, Pg ID 3488).  However, Dr. Drouillard's
opinion does not speak to whether Kensu's condition remained the same since the prior verdict.

insufficient to treat his shoulders.  His care did not significantly change since the verdict.  If his care in the prior case was deliberately indifferent, a reasonable jury could conclude that pain medication and a hot water bottle, which he had until July 2017, amounted to insufficient care in this case, especially considering the fact that Kensu was recommended for surgery to repair at least his right shoulder.

There is also an issue of material fact on the subjective component as to Drs. Bomber and Lacy.  Both doctors had authority over Kensu's medical care.  In March 2016, his treatment was found to be deliberately indifferent to his serious medical needs.  Kensu's medical condition did not change after the verdict, nor did his treatment.  The medical records document his acute shoulder issues as late as January 2017, and in January and July 2017 both doctors denied Kensu's hot water bottle and then the pain medication—a contention neither defendant contests. Therefore, it may be inferred that the doctors were aware of and appreciated his serious medical need at the time that they ended all treatment for his shoulders. While the defendants argue that Kensu's claim merely reflects a difference in opinion concerning his treatment, since his shoulder remained status quo from the time of the prior verdict in which "no treatment" was deemed to show deliberate indifference, a reasonable jury could conclude that they canceled the medication with deliberate indifference to Kensu's medical needs.

As for defendant Gulick, though the Court determined that there is a question of material fact as to whether she was sufficiently personally involved in Kensu's medical care to subject her to liability, whether she was deliberately indifferent to his medical needs is a different story. Gulick was the Health Services Administrator, and thus held a supervisory role in prison healthcare. Her involvement in the email chain on Kensu's requested accommodations, as discussed above, is somewhat ambiguous as to whether it was her goal to have the requests denied. But, it is clear that Gulick was not in a position to make medical decisions herself, as she was not a medical professional. (Dkt. 152, Exhibit 12, Gulick deposition transcript, pp. 50, 88-89). And, there is no reason to assume that when she directed Dr. Lacy to meet with Kensu and address his requests, she appreciated a risk of harm to Kensu from the denial of a particular medical procedure or medication/supplement. There is no evidence that she reviewed Kensu's medical records, that she was aware of his health care and health issues except for his requests for special accommodations, or that she was acting in any way other than in her role as an administrator in health care. Accordingly, Gulick was not deliberately indifferent to Kensu's serious medical needs.

In his response to the motions, Kensu argues that collateral estoppel precludes defendants Borgerding, Bomber, and Lacy from relitigating deliberate indifference as to his shoulder injury because treatment of his shoulders was at

44

issue in his prior suit, *Kensu v. Stieve, et. al*, Case No. 13-10279, (E.D. Mich. 2016), and he received a judgment in his favor following a favorable jury verdict. (Dkt. 151, p. 3, Dkt. 152, pp. 26-27).  In order for him to show that collateral estoppel applies, Kensu must demonstrate the following: (1) the precise issue raised in the present case must have been raised and actually litigated in the prior proceeding; (2) determination of the issue must have been necessary to the outcome of the prior proceeding; and (4) the party against whom estoppel is sought must have had a full and fair opportunity to litigate the issue in the prior proceeding. *N.A.A.C.P., Detroit Branch v. Detroit Police Officers Ass'n (DPOA)*, 821 F.2d 328 (6th Cir. 1987).  Borgerding asserts that Kensu fails on the first prong because the present lawsuit claims a violation of his rights in relation to health care and treatment that Kensu received after the verdict in *Stieve*.  Bomber and Lacy assert that the doctrine does not apply to them because the prior judgment was not against either of them; Bomber prevailed in the *Stieve* lawsuit on his motion for summary judgment and Lacy was not a defendant in the action.  The defendants have the better argument here.

In reviewing the amended complaint from Kensu's prior lawsuit, the latest date specified as to Borgerding's actions appears to have been 2012 and even assuming that it continued beyond that date, it could not have included treatment that had not yet occurred.  Of course, plaintiff argues that his condition is the same

45

and he has received no care at all for the shoulder, so the issue in both cases is the same.  But the medical records do not bear this out.  As discussed above, at a minimum, Kensu received Naprosyn and a hot water bottle for a period to relieve his shoulder symptoms during the period relevant to this suit.  The Court concluded above that under the circumstances presented, it is for a jury to decide whether that care meets constitutional muster.  On these facts plaintiff has not established that his claim concerning his shoulder in this case is the same claim on which he was successful in his prior case.

Collateral estoppel does not apply against Borgerding because, although he was a defendant in the prior suit, he is not a defendant as to this claim.  As discussed above, Borgerding's only direct medical treatment since March 2016 involved Kensu's sinusitis and decision to defer the medication Nasalcrom, neither having anything to do with Kensu's shoulders.  And, Borgerding's participation in the email chain indicates that his sole involvement was to instruct the others on how to administratively document Dr. Lacy's handling of the accommodations requests.  He was not directly involved in the denial, and thus is not subject to suit for deliberate indifference to Kensu's shoulders.

Collateral estoppel does not apply to Bomber and Lacy because there is no prior unfavorable judgment against them.  Bomber won summary judgment on the deliberate indifference claim in *Stieve*; thus, the deliberate indifference judgment

46

was not against him.  (*See* Case No. 13-10279, Dkt. 114).  Lacy was not a party to the *Stieve* case.  Kensu has not established that Lacy was in privy with the defendants in *Stieve*, and has cited no authority suggesting that his employment along with others who were defendants against whom judgments were entered in *Stieve*, should render him also bound by the judgment.[11]

C.   First Amendment Retaliation

Kensu claims MDOC defendants Borgerding, Haas, and Gulick, and Corizon defendant Bomber retaliated against him in violation of the First Amendment by denying him medical care after his favorable jury verdict in March 2016.  (Dkt. 83, Count I).  However, the specifics of his claim are not altogether clear.  In the amended complaint, Kensu alleges that after his verdict, the defendants conspired to not treat his medical needs.  (*Id.* at ¶ 13).  He says that the defendants worked together to take away medical items in his possession in retaliation for the verdict and for filing grievances.  (*Id.* at ¶ 15).  By way of example, Kensu points to the email chain about his requested accommodations and Dr. Lacy's denial of his special accommodations request discussed at length above.  He characterizes the denial as "pure and simple retaliation."  (*Id.* at ¶ 16-18).  He

---

[11] "Privity is limited to 'a successor in interest to the party, one who controlled the earlier action, or one whose interests were adequately represented.'"  *United States v. Vasilakos*, 508 F.3d 401, 406 (6th Cir. 2007) (quoting *Sanders Confectionery Prods., Inc. v. Heller Fin., Inc.,* 973 F.2d 474, 481 (6th Cir. 1992)).  Lacy did not have control over the earlier action and his interests were not represented.

provided no other examples of retaliatory denial of medical care.  In his responses to the motions for summary judgment, Kensu relies on the denial of the special accommodations as proof of retaliation.  (Dkt. 151, pp. 17-19; Dkt. 152, pp. 5-12).  It appears, then, that the claim is that the defendants retaliated against Kensu for his 2016 verdict by taking away or denying special accommodations.

MDOC defendants argue they had no direct involvement in Kensu's medical care, and this lack of involvement cannot be the basis of a retaliation claim.  (Dkt. 138, p. 9).  Defendant Bomber says that, since he was not a party to Kensu's prior successful litigation, "[i]t strains credulity to suggest" that he is retaliating against Kensu for the 2016 verdict.  (Dkt. 140, p. 5).  Bomber also argues that, even if Kensu has filed grievances against him (Kensu alleges in the complaint that he filed a grievance against Bomber in 2011), Kensu has provided no evidence that the denial of his requests for special accommodations was made in retaliation.  Further, his involvement in the email chain about the special accommodations does not evince any retaliatory motive.  Dr. Bomber contends that Kensu cannot prove the second and third elements of the retaliation claim because he has not been deterred from filing additional lawsuits against the defendants and his bare assertions of a causal connection between the protected activity and adverse action are insufficient.  (Dkt. 140, pp. 7-8).

Retaliation based on a prisoner's exercise of constitutional rights violates the Constitution. *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999). To establish a First Amendment retaliation claim, the plaintiff must prove that: (1) the plaintiff engaged in activities protected by the Constitution or statute; (2) the defendant took an adverse action that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) the adverse action was taken at least in part because of the exercise of the protected conduct. *Id.* It is well-established that prison officials are not permitted to take adverse actions against inmates in response to the exercise of their First Amendment rights. As the Sixth Circuit has observed, "[p]risons have an interest in keeping the inmates as safe and secure as possible while imprisoned, and truthful speech that describes possible abuses can actually be quite consistent with that objective." *Griffin v. Berghuis*, 563 Fed. Appx. 411, 416 (6th Cir. 2014) (quoting *Bridges v. Gilbert*, 557 F.3d 541, 551 (7th Cir. 2009)). At the same time, "conclusory allegations of retaliatory motive unsupported by material facts will not be sufficient to state a claim under § 1983." *Harbin-Bey v. Rutter*, 420 F.3d 571, 580 (6th Cir. 2005) (internal quotation omitted); *see also Cox v. Jackson*, 579 F. Supp. 2d 831, 848 (E.D. Mich. 2008).

In support of his retaliation claim, Kensu provides much argument but little evidence to defend against summary judgment on the third element of the claim.

Kensu has, however, provided evidence that he engaged in protected activity: he filed a prior lawsuit against MDOC personnel winning a jury verdict in March 2016 and he filed grievances against some, if not all, of the defendants.[12] *Eckerman v. Tennessee Dep't of Safety*, 636 F.3d 202, 208 (6th Cir. 2010) ("The filing of a lawsuit to redress grievances is clearly protected activity under the First Amendment.") (citing *Thaddeus-X v. Blatter,* 175 F.3d 378, 396 (6th Cir. 1999) (*en banc*)); *Herron v. Harrison*, 203 F.3d 410, 415 (6th Cir. 2000) (Filing a non-frivolous grievance is protected conduct under the First Amendment).

Further, there is support for the proposition that the denial of special accommodations may constitute adverse action that would deter a person of ordinary firmness from filing lawsuits or grievances in the future. *See Crowell v. Parsons*, 2016 WL 2892670, at *3 (W.D. Mich. May 18, 2016) ("The Court agrees with Plaintiff in that terminating a person's special health accommodations could deter a person of ordinary firmness from filing grievances."). Nevertheless, even if the denial of special accommodations in this case constitutes such adverse action, Kensu has not demonstrated the third element—a causal connection between the adverse action and the protected conduct.

---

[12] While Kensu did not provide any of these grievances to the Court, he made a sworn statement in his affidavit that he filed grievances against defendant Bomber concerning his medical care.  (Dkt. 151-3, ¶ 48).  And, Bomber does not contest Kensu's representation.

Kensu is suing defendants Borgerding, Bomber, Haas, and Gulick for retaliation based on the denial of his special accommodations.  However, it was Dr. Lacy—who is not named in the retaliation claim—who denied the accommodations, not the named defendants.  Kensu argues that the email chain referencing Dr. Lacy going to meet with Kensu to address his list of requests is evidence that the named defendants retaliated against him for his prior successful lawsuit and grievances by deciding to deny his accommodations.  But, as explained above, the record evidence does not suggest that any of the named defendants told Dr. Lacy to deny the accommodations or suggested to him that they should be denied.  Though the Court found a question of material fact as to whether Gulick aimed to influence a denial, ultimately it was not her decision as she was not a medical professional.  Further, Gulick's involvement in the email chain appears to be administrative only, directing that Kensu's requests be addressed and documented in the medical record.  As for the other defendants, there is no evidence that they made it their purpose to deny the requests rather than to address the requests.  Instead, the emails communicate that prison personnel wanted Kensu's requests handled thoroughly, and wanted Dr. Lacy to meet with Kensu to address each request in turn, explaining why it was granted or denied.

While inferences are to be drawn in the light most favorable to the non-movant, only *reasonable* inferences are to be drawn.  A reasonable jury could not

infer from the referenced emails that the named defendants intended the opposite of what was contained in the plain language of the emails essentially based on plaintiff's suspicion.  Kensu contends there is one particular email that shows or raises an inference that the defendants were aiming to treat him differently from other prisoners—an email from Dr. Lacy in which he states, "If we want to show that we are treating him just like everyone else, then we should follow the normal chain of command."  (Dkt. 74-11).  Reading this email in context shows that this was not an email about retaliating against Kensu.  Rather, Dr. Lacy was expressing concern that based on prior experience, his visiting Kensu could be counterproductive and as a result, the normal chain of command should be followed.  The normal chain would involve a doctor in the prison—not Dr. Lacy who was the regional medical doctor for Corizon—visiting him instead.  The sequence was that on June 24, 2016, Gulick emailed Dr. Bomber that the legal department needed Dr. Lacy go into the medical records and document his conversations with Kensu.  She said Dr. Lacy needed to address every accommodation request, whether he is allowed the item, and if not, why.  On June 26th, Dr. Lacy sent the email that included the language about following the normal chain of command if they wanted to show Kensu was being treated the same as everyone else.  Dr. Lacy explained that it would be best if Dr. Hussain visited Kensu about the requests because "it did not go well last time" Dr. Lacy

visited him.  Dr. Lacy said that Kensu told him that if MDOC was going to follow policy, they would have sent the doctor from the prison instead of Dr. Lacy to see him.  Ultimately, of course, Dr. Lacy saw Kensu to address the requests.  This email does not suggest that the defendants' purpose was to deny his accommodations in retaliation for his litigation conduct, nor does it otherwise reveal any retaliatory motive.  The Court is hard-pressed to see how a jury could reasonably infer from Dr. Lacy's email, or the email chain in general, that the named defendants retaliated against Kensu by having Dr. Lacy deny his special accommodations.

Nor does the timing of events—jury verdict in March 2016, the emails, then the July 2016 denial—demonstrate causal connection.  Because direct evidence of causation is rare, to demonstrate a genuine dispute of fact as to the third element, "[c]ircumstantial evidence, like the timing of events or the disparate treatment of similarly situated individuals, is appropriate." *Thaddeus-X*, 175 F.3d at 399. "Temporal proximity" between the protected conduct and the adverse action, alone, may provide the basis for inferring at least partial retaliatory intent. *Muhammad v. Close*, 379 F.3d 413, 417-18 (6th Cir. 2004).

Here, the temporal proximity between the adverse action and alleged protected conduct is a fairly large gap.  Looking to the prior lawsuit as protected activity, Kensu won the jury verdict in March 2016 and Dr. Lacy denied his

53

accommodations in July 2016.  The judgment in the prior case did not involve

Gulick, Lacy or Bomber, thus undercutting the idea of a retaliatory motive as to

them.  The email discussions about his accommodations requests began at the end

of June, about three months after the verdict.  This three month gap is too long,

without some other evidence of retaliatory motive, to create an issue of fact for the

jury on the third element.  *See Hafford v. Seidner*, 183 F.3d 506, 515 (6th Cir.

1999) (delay of two to five months between protected conduct and adverse action

is too long to create an inference of retaliation, without further evidence); *Cooper*

*v. City of North Olmstead*, 795 F.2d 1265, 1272 (6th Cir. 1986) (delay of four

months between protected conduct and adverse action insufficient to support an

inference of retaliation); *Williams v. Kelley,* No. 07–10999, 2008 WL 4404029, at

*13 (E.D. Mich. Sept.26, 2008) (four month period between filing of grievance and

issuance of major misconduct ticket insufficient to support causal connection in

retaliation claim);  *Kinkus v. Village of Yorkville, Ohio,* 289 Fed. App'x 86, 92 (6th

Cir. 2008) (one-month lapse between incident and disorderly conduct charge

insufficient to establish retaliatory animus).  Looking to the grievances as protected

activity, again, Kensu did not provide copies of the grievances, nor did he say in

his affidavit when he filed them.  His only temporal statement is that he began

writing grievances against Bomber starting in 2011 (Dkt. 151-3, ¶ 48) and he

grieved Dr. Lacy, not named in this claim, in May 2016 for failure to treat his

knees.  (*Id.* at ¶ 51).  It does not appear that Kensu submitted a grievance against

Dr. Bomber after March 2016 and before the filing of the amended complaint.

In short, Kensu provides no further support beyond conclusory allegations of

retaliatory motive.  *See Harbin–Bey v. Rutter,* 420 F.3d 571, 580 (6th Cir. 2005)

("[C]onclusory allegations of retaliatory motive 'unsupported by material facts will

not be sufficient to state . . . a claim under § 1983.'").  This flaw is especially

noticeable as to defendant Haas, who was not part of the email chain or the denial

of accommodations.  Kensu makes no specific allegation or argument about Haas'

involvement in any retaliation.  Summary judgment should be granted to the

defendants on this claim.

D.    Civil Conspiracy

In Count XIII of his Second Amended Complaint, Kensu claims civil

conspiracy against all defendants.  (Dkt. 83, Count XIII).  He says that the

defendants each participated in the constitutional violations described in the

complaint and conspired with each other before and while his constitutional rights

were violated, and that each count in the complaint demonstrates a plan to engage

in the violative conduct.  (*Id.* at ¶ 184).  While the amended complaint allegation is

quite broad, seemingly encompassing every constitutional violation in the

complaint, Kensu's arguments in response to the summary judgment motion

demonstrate that his civil conspiracy claim is targeted at the deliberate indifference

and retaliation claims, specifically, the email chain and denial of special accommodations.  (Dkt. 151, pp. 24-25; Dkt. 152, pp. 28-29).

A civil conspiracy under § 1983 is "an agreement between two or more persons to injure another by unlawful action." *Hensley v. Gassman*, 693 F.3d 681, 695 (6th Cir. 2012) (quoting *Hooks v. Hooks*, 771 F.2d 935, 943-44 (6th Cir. 1985).  Express agreement among all the conspirators is not necessary to find the existence of a conspiracy.  *Id.*  "All that must be shown is that there was a single plan, that the alleged coconspirator shared in the general conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy that caused injury to the complainant."  *Hooks*, 771 F.2d at 943-44.  The Sixth Circuit has acknowledged that because "[r]arely in a conspiracy case will there be direct evidence of an express agreement among all the conspirators to conspire, ... circumstantial evidence may provide adequate proof of conspiracy."  *Weberg v. Franks* 229 F.3d 514, 528 (6th Cir. 2000).  "It is well-settled that conspiracy claims must be pled with some degree of specificity and that vague and conclusory allegations unsupported by material facts will not be sufficient to state such a claim under § 1983."  *Gutierrez v. Lynch,* 826 F.2d 1534, 1538 (6th Cir. 1987); *Hamilton v. City of Romulus*, 409 Fed. Appx. 826, 835-36 (6th Cir. 2010) (citing *Spadafore v. Gardner*, 330 F.3d 849, 854 (6th Cir. 2003)).

The MDOC defendants argue that Kensu did not plead the conspiracy claim with the requisite specificity.  (Dkt. 138, at p. 9-10).  Kensu counters that he has presented numerous instances of conduct that raise a question of fact as to whether the defendants conspired to deprive him of his rights.  He points to the timeline of communications between the defendants regarding his requested accommodations and Dr. Lacy's denial of those accommodations.  (Dkt. 151, p. 24).

As an initial matter, the undersigned agrees with MDOC defendants that the conspiracy complaint allegation is insufficient.  After incorporating all preceding paragraphs by reference, the allegation consists of the following:

> The defendants who each participated in each of the constitutional violations described herein conspired with each other and others before and while Kensu's constitutional rights were violated. Each count contained herein clearly demonstrates a plan by the defendants to engage in the conduct in which they engaged in to violate Plaintiff's constitutional rights as described herein.

(Dkt. 83, ¶ 184).  He also says he was harmed as a result.  Though he references the prior twelve counts as demonstrating a conspiracy, he made no attempt to identify a single plan, a general conspiratorial objective, or an overt act in furtherance of the plan for each of his claims.  Simply incorporating all of the preceding paragraphs to state his civil conspiracy claim still falls short of the required specificity.  For example, in Count I, retaliation, Kensu alleges that defendants Borgerding, Bomber, Haas, and Gulick refused to provide him with

medical care in retaliation for his protected conduct, and that there was a causal

connection between Kensu's protected conduct at the retaliatory actions.  (Dkt. 83,

Count I).  This claim includes no allegation about a plan or agreement between

these four defendants to retaliate against Kensu, nor does it contain an allegation

that refusals of care constituted overt acts in furtherance of a conspiracy.

Similarly, in Count II, deliberate indifference, Kensu merely alleges that the named

defendants refused to adequately treat his medical needs and made the decision to

withhold appropriate medical care.  There is no allegation of a plan or conspiracy,

and no allegation of a specific overt act in furtherance thereof.  Kensu's remaining

claims suffer from the same deficiencies.  For these reasons, the undersigned

suggests that Kensu's claim of civil conspiracy was not adequately pleaded, and

this claim should be dismissed.

However, even if the conspiracy claim were sufficiently pleaded regarding

deliberate indifference to medical needs and retaliation, the claim should be

dismissed.  Absent an unlawful action causing injury, a plaintiff cannot prove the

elements required to support a claim for conspiracy.  *Farhat v. Jopke*, 370 F.3d

580, 599 (6th Cir. 2004); *Graham v. City of Mentor*, 118 Fed. Appx. 27, 32 (6th

Cir. 2004) (affirming dismissal of conspiracy claim where plaintiffs failed to show

viable underlying retaliation claim).  Indeed, "to prevail on a § 1983 civil

conspiracy claim, the plaintiff must show an underlying constitutional violation."

*Umani v. Mich. Dep't of Corr.*, 432 Fed. Appx. 453, 462 (6th Cir. 2011).  The

underlying constitutional violation which plaintiff claims here is deliberate

indifference to Kensu's serious medical needs in violation of the Eighth

Amendment and retaliation in violation of the First Amendment, all based on the

emails and denial of special accommodations.  Because the undersigned has

concluded that the Corizon and MDOC defendants are entitled to summary

judgment on those claims except for deliberate indifference to his shoulder issues,

the defendants are also entitled to summary judgment on the civil conspiracy

claim.  *See Bradford v. Owens*, 2016 WL 7015662, *23 (W.D. Ky. Nov. 29, 2016)

(B]ecause this Court has concluded that Defendants are entitled to summary

judgment on Plaintiff's Eighth Amendment claims, his civil conspiracy

claim necessarily fails.").

As for the claim of deliberate indifference to his shoulder care (which

involves defendants Bomber and Lacy only), the principle facts relied on to show

conspiracy are the denials of the requested special accommodations.  However,

there is no allegation that Drs. Bomber and Lacy acted in concert to deprive him of

medical care.  Dr. Bomber and others discussed Dr. Lacy seeing Kensu, addressing

each of the requests, and explaining in the medical record whether and why each

was granted or denied.  There is no evidence that the defendants planned or agreed

that Dr. Lacy would deny them all.  For this additional reason, summary judgment should be granted on this claim.

      E.    <u>Dietary Supplement Health and Education Act (DSHEA)</u>

MDOC defendants Borgerding, Gulick, Russell, Wallace, and Haas seek summary judgment on Kensu's DSHEA claim.  Kensu alleges that "DSHEA guarantees all American citizens the absolute right to access to [sic] natural health supplements."  (Dkt. 83, ¶ 138).  He further alleges that these defendants have refused to allow him access to supplements in violation of the statute.  MDOC defendants say that DSHEA does not provide a private right of action for a prisoner for denial of supplements.  (Dkt. 138, p. 11).  According to MDOC, the statute sets forth that the FDA regulates vitamins, minerals, herbs, and other dietary supplements.

Kensu cites no case in which a court found a private right of action under DSHEA.  Indeed, it appears that MDOC is correct that DSHEA in general does not confer a private right of action.  *See Aaronson v. Vital Pharmaceuticals, Inc.*, 2010 WL 625337, at *3 (S.D. Calif. Feb. 17, 2010); *NVE, Inc. v. Dep't of Health & Human Servs.*, 2004 WL 5561798 (D.N.J. Aug. 4, 2004).  In order to create a private right of action, the statute must unambiguously confer rights, not merely benefits.  *Baker v. McCollan*, 443 U.S. 137, 144 n. 3 (1979).  DSHEA appears to confer benefits, not rights.  Where the statute references a person's right of access,

it is to say that the statute is meant to "protect[] the right of access of consumers to *safe* dietary supplements."  108 Stat. 4325, § 2(15)(A) (emphasis added).  Thus, the purpose of the statute is to regulate the creation and sale of dietary supplements through the FDA, a benefit to the public, not the right of access to those supplements.  21 U.S.C. § 343, 350.  Further, although Kensu's claim is brought under § 1983, this fact by itself does not create a right of action under any federal statute.  *Baker v. McCollan*, 443 U.S. 137, 144 n. 3 (1979) ("Section 1983, however, does not itself create federal rights, but only provides judicial relief for the violation of rights arising under the Constitution or laws of the United States."); *see also Gonzaga Univ. v. Doe*, 536 U.S. 273, 274 (2002) ("Although the question whether a statutory violation may be enforced through § 1983 is a different inquiry from that involved in determining whether a private right of action can be implied from a particular statute, the inquiries overlap in one meaningful respect—in either case it must first be determined whether Congress *intended to create a federal right*") (emphasis in original) (internal citation omitted).  For these reasons, summary judgment should be granted on this claim.

F.    Fourteenth Amendment Denial of Access to the Courts

Kensu's Fourteenth Amendment denial of access to the Court claim is against MDOC defendant Taylor.  Kensu alleges that Taylor actively prevented him from filing grievances.  (Dkt. 83, ¶¶ 142, 143).  Kensu says that Taylor's

actions have deprived him of his right of access to the courts.  In support of his

claim, Kensu provides the following facts from his affidavit:  He has attempted to

appeal many of his grievances but was prevented from doing so by Taylor, who

told him she was blocking his appeals process to prevent him from engaging in

litigation.  (Dkt. 151-4, ¶ 38).  Taylor denied his grievances as late when they were

not late and denied them as vague but would not give him an opportunity to

explain.  (*Id.*).  Kensu met with MRF Warden Warren, a non-party, to discuss

Taylor's allegedly fraudulent denials of his grievances.  (*Id.* at ¶ 39).  Warden

Warren told him that defendant Russel told Warren to reject the grievances.  (*Id.*).

Kensu also met with defendant Haas to discuss, in part, "Taylor's interference with

the grievance process," and Haas approved of Taylor's actions.  (*Id.* at ¶ 40).

Finally, Kensu says that Taylor told him she was told to respond to his grievances

"with fabrications and phony denials."[13]  (*Id.* at ¶ 41).

The undersigned will analyze this claim under the First Amendment.[14]

*County of Sacremento v. Lewis*, 523 U.S. 833, 843 (1998) ("[I]f a constitutional

claim is covered by a specific constitutional provision, . . . the claim must be

---

[13] In his response to the motions, Kensu also says that his deposition testimony establishes Taylor's wrongful actions but does not cite specific portions of the testimony.  (Dkt. 151, p. 27).  The undersigned has reviewed the indices of both of Kensu's depositions for discussion of Taylor's denials, but could not find anything relevant to this claim.  (Dkt. 151, Exhibits 5 and 6).

[14] It is not clear why Kensu brought the claim under the Fourteenth Amendment.

62

analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process.") (citing *United States v. Lewis*, 520 U.S. 259, 272, n. 7 (1997)).  The First Amendment protects inmates from being denied meaningful access to the courts by the states.  *Lewis v. Casey*, 518 U.S. 343, 350 (1996).  An inmate alleging a denial of access to the courts must prove that he suffered an actual injury or harm that is connected to a direct appeal from a conviction, or habeas corpus petitions, or civil rights actions under § 1983.  *Id.* at 349, 355; *Walker v. Mintzes*, 771 F.2d 920, 932 (6th Cir. 1985) (An inmate may show actual harm by demonstrating that a denial of his access to the courts somehow prejudiced his rights in a lawsuit.).  To state a § 1983 claim for the denial of access to the courts, a plaintiff must allege that the deprivation was the result of intentional conduct, *see Sims v. Landrum*, 170 Fed. Appx. 954, 957 (6th Cir. 2006), and must make some showing of prejudice or actual injury resulting from the challenged conduct.  *Lewis*, 518 U.S. at 351.  This can be done by showing that the deprivation resulted in "the late filing of a court document or the dismissal of an otherwise meritorious claim."  *Pilgrim v. Littlefield*, 92 F.3d 413, 416 (6th Cir. 1996).

Kensu's claim is that Taylor's allegedly fraudulent or fake denials of his grievance appeals denied him access to the courts.  However, Kensu makes no showing of any injury to his civil rights litigation.  *See Lewis*, *supra*; *see also*

63

*Henricks v. Ohio Dept. of Rehabilitation & Correction*, 2011 WL 3652423, at *6

(S.D. Ohio Aug. 18, 2011) (Inmate failed to state a denial of access to the court

claim based on prison official's failure to follow the grievance process because

inmate did not allege that the failure caused injury or precluded meaningful access

to the court).  For example, there are no facts demonstrating that a civil rights suit

filed by Kensu was dismissed for failure to exhaust administrative remedies

through the grievance process or that any of his filings in any of his lawsuits were

late because of Taylor's actions.  And, even if Kensu was prevented from pursuing

his grievances, the grievance process would be rendered unavailable, and he would

be excused from exhausting administrative remedies before initiating a civil rights

lawsuit.  Thus, he would not be prevented from taking the issue to court.  *See Ross*

*v. Blake*, 136 S. Ct. 1850, 1858-59 (2016) (reiterating that, if the prisoner is barred

from pursuing a remedy by policy or by the interference of officials, the grievance

process is not available, and exhaustion is not required); *Kennedy v. Tallio*, 20 Fed.

Appx. 469, 470 (6th Cir. 2001).  Moreover, to the extent Kensu is claiming that

Taylor deprived him of his right to seek redress through the grievance process, the

claim fails because Kensu has no constitutional right to an effective grievance

process.  *See Hewitt v. Helms*, 459 U.S. 460, 467 (1983); *Walker v. Mich. Dep't of*

*Corr.*, 128 Fed. Appx. 441, 445 (6th Cir. 2005); *Argue v. Hofmeyer*, 80 Fed. Appx.

427, 430 (6th Cir. 2003).  For these reasons, Taylor is entitled to summary

judgment on this claim.

      G.      <u>Fourteenth Amendment Due Process – Denial of a Fair Hearing</u>

      Kensu brought a Fourteenth Amendment due process claim against MDOC

defendants Evers, McRoberts, Campbell, Klee, Salisbury, Nichols, Donaghy,

Martin, Eaton, Killough, Webb,[15] and Russell for denying him "an opportunity to

have a fair hearing on any of the 33 tickets issued to him at ARF."  (Dkt. 83, Count

IX).  Defendants argue that Kensu did not tie any of the misconducts to the named

defendants; either their involvement with issuing the misconduct or how they

denied him an opportunity for a fair hearing.  (Dkt. 138, p. 12).  Kensu says that

his deposition testimony—again without citation to any particular pages of the two

transcripts—and his affidavit at paragraphs 2-31 provides factual support for this

claim.  (Dkt. 151, pp. 27-28).  In his affidavit, Kensu says that defendant Evers told

him that he would be ticketed into maximum security.  Kensu alleges that he

received 33 misconduct tickets against him while at ARF, and that he was not

permitted to appeal the 33 tickets, so he received 33 points.  (Dkt. 151-4, ¶ 12, 14).

Kensu says the hearing was not according to MDOC policy because he was not

---

[15] MDOC defendants Eaton, Lewis, Salisbury, and Webb came late to this action.  They
did not file an answer to the complaint until January 16, 2019.  On July 18, 2019, the parties
stipulated to allow the instant motion for summary judgment to apply to these four defendants as
to any defenses raised on behalf of the other defendants that are in common with the claims
against Eaton, Lewis, Salisbury, and Webb.  (Dkt. 179).

permitted to offer any witnesses or evidence and was not given an opportunity to appeal.  According to Kensu, defendants Martin, Donaghy, Evers, McRoberts, Campbell, and Klee "wrote phony tickets or instructed other officers to write phony tickets."  (*Id.*).  Regarding those tickets, Kensu says that he "discussed the denial of [his] appeal forms with all of the Defendants and [he] also grieved the violation."[16]  (*Id.* at ¶ 14).  He says "all of the Defendants" prevented him from appealing or challenging the fraudulent charges.  (*Id.*).  Because of these tickets, Kensu "received over a year of severe sanctions."  (*Id.* at ¶ 12).  It is not clear if his security level was increased, and there is no information in the record about what sanctions he received.

Defendants did not bring forth any evidence to rebut Kensu's statements about inadequate process he received on the 33 tickets.  However, despite the defendants' failure, it appears that the law is on their side because Kensu has not demonstrated that he had a liberty interest in a particular security level or in living without sanctions.

The Fourteenth Amendment protects an individual from deprivation of life, liberty or property, without due process of law."  *Bazetta v. McGinnis*, 430 F.3d 795, 801 (6th Cir. 2005).  To establish a Fourteenth Amendment procedural due process violation, Kensu must show that one of these interests is at stake.

---

[16] Based on this statement, it appears that Kensu was permitted to appeal the tickets.

*Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). A prisoner does not have a protected liberty interest in prison disciplinary proceedings unless the sanction "will inevitably affect the duration of his sentence" or the resulting restraint imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *See Sandin v. Conner*, 515 U.S. 472, 486-87 (1995); *Williams v. Lindamood*, 526 Fed. Appx. 559, 562 (6th Cir. 2013) ("An inmate establishes a liberty interest when a change in conditions of confinement 'imposes atypical and significant hardship on [him] in relation to the ordinary incidents of prison life.'") (quoting *id.*)). The Supreme Court has recognized that "the Constitution itself does not give rise to a liberty interest in avoiding transfer to more adverse conditions of confinement." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) (citing *Meachum v. Fano,* 427 U.S. 215, 225 (1976)); *see also Williams v. Bass*, 63 F.3d 483, 485 (1995) ("[A]n inmate possesses no inherent constitutional right to placement in any particular prison or in any particular section within the prison system.") (citations omitted). And, the Sixth Circuit routinely has held that misconduct convictions that do not result in the loss of good time are not atypical and significant deprivations and therefore do not implicate due process. *See*, *e.g.*,*Ingram v. Jewell*, 94 Fed. Appx. 271, 273 (6th Cir. 2004); *Harbin–Bey v. Rutter*, 420 F.3d 571, 577 (6th Cir. 2005) ("An increase in security classification ... does not constitute an 'atypical and significant' hardship in relation to the ordinary

incidents of prison life because a prisoner has no constitutional right to remain

incarcerated in a particular prison or to be held in a specific security

classification.") (internal quotation marks and citation omitted)); *Green v.*

*Waldren*, 2000 WL 876765, *2 (6th Cir. June 23, 2000); *Staffney v. Allen*, 1999

WL 617967, *2 (6th Cir. Aug.12, 1999).

      The evidence that Kensu has proffered does not demonstrate that a liberty

interest was implicated in the misconduct tickets and change in security.  Kensu

does not clearly state whether his security level was indeed increased to Level 5,

and if so, what hardship he faced in the increased security level.  *See Joseph v.*

*Curtin*, 410 Fed. Appx. 865, 869 (6th Cir. 2010) ("Joseph's complaint does not

include any allegations about the conditions of the security level IV prison to

suggest that it imposes an atypical and significant hardship.  Indeed, in Michigan

there are actually two higher security levels than level IV.  Mich. Admin. Code R.

791.4401.").  Further, Kensu does nothing to explain or demonstrate what

sanctions he faced for over a year after the tickets and points were issued, and

whether these sanctions constituted an "atypical and significant hardship" on him,

other than the taking of certain of his property items, which is addressed below.

And, Kensu has not alleged or discussed a loss of good time.  *See Ingram*, *supra*.

Based on the foregoing case law, it does not appear that Kensu has demonstrated

that he had a liberty interest implicated by either his possible change in security

level or "over a year of severe sanctions."  Accordingly, the undersigned

recommends that these defendants be granted summary judgment on this claim.

  H.   Fourteenth Amendment Due Process – Loss of Property Claim

  In Count XI, Kensu brought a claim for deprivation of his property without

due process of law against MDOC defendants Gallatin, Martin, Lewis, Evers,

Donaghy, McRoberts, Campbell, Klee, Wallace, Eaton, Killough, Webb, and

Russell.  Kensu alleges that these defendants seized certain personal property

items, such as his guitar, amplifier, keyboard, wedding rings, clothing, art supplies,

the contents of three legal lockers, and other things, without due process and did so

as punishment for his grievances and lawsuits.  (Dkt. 83, at ¶ 178).

  The defendants first argue that the complaint allegation is insufficient to

state the claim because Kensu did not tie property deprivations to any of the named

defendants.  (Dkt. 138, at p. 13).  Second, the defendants argue that while at the

Gus Harrison facility (ARF), Kensu had at least nine administrative hearings on

property issues, (*Id.* at 14; Ex. C, Property Hearings, pp. 1-40), and that adequate

state post-deprivation remedies existed for Kensu under the *Parratt* doctrine.  (*Id.*

at 14-16).

  In *Parratt v. Taylor*, 451 U.S. 527 (1981), the Supreme Court held that the

negligent deprivation of a prisoner's property does not violate due process if

adequate state remedies are available to redress the wrong.  The *Parratt* doctrine

69

has been extended to cover intentional deprivations of property.  *Copeland v.*

*Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (citing *Hudson v. Palmer*, 468 U.S.

517, 533-36 (1984)).  Kensu's claims fails because he has not shown that state

post-deprivation remedies were inadequate to redress his claimed losses.  The

Sixth Circuit in *Copeland*, *supra*, summarized the post-deprivation remedies

available to state prisoners in Michigan, including an action to recover possession

of goods or chattels and a procedure by which an individual may be compensated

for alleged unjustifiable acts of state officials.  57 F.3d at 480.  The court

concluded that "the appeal of administrative decisions to the state circuit court

provides an adequate remedy for violations of due process for purposes of *Parratt*

*v. Taylor*."  *Id.* (citations omitted).   Because adequate state remedies were

available to Kensu, no deprivation of property without due process resulted.

Summary judgment should be granted on this claim.

## III.   CONCLUSION

For the foregoing reasons, the undersigned concludes as follows:

(1)  That summary judgment be granted to defendants Borgerding, Haas, and

Gulick on Kensu's Eighth Amendment deliberate indifference claim,

(2) That summary judgment be granted to defendants Bomber and Lacy on

the deliberate indifference claim except for the claim regarding shoulder care,

(3) And that summary judgment be granted in full on the following claims: First Amendment retaliation, civil conspiracy, DSHEA, and the Fourteenth Amendment claims of denial of access to the courts, denial of a fair hearing, and loss of property without due process.

Whether or not the Court adopts this recommendation, the following counts, which were not included as part of the defendants' dispositive motions, also remain:  Counts III, VI, VII, VIII, X, and XII.

## IV.   RECOMMENDATION

For the reasons set forth above, the undersigned **RECOMMENDS** that MDOC defendants' motion for summary judgment (Dkt. 138) be **GRANTED** and that Corizon defendants' motion for summary judgment (Dkt. 140) be **GRANTED IN PART**.

The parties to this action may object to and seek review of this Report and Recommendation but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).  Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1981).  Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health*

*and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc.  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed.R.Civ.P. 72(b)(2), Local Rule 72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc.  If the Court determines that any objections are without merit, it may rule without awaiting the response.

 Date:  August 20, 2019                          s/Stephanie Dawkins Davis
                                                 Stephanie Dawkins Davis
                                                 United States Magistrate Judge